**EL PASO INDEPENDENT SCHOOL DISTRICT, Plaintiff,**

v.

**RICHARD R., as next friend of R.R., et al., Defendants.**

**R.R., by his next friend of E.R., Plaintiffs,**

v.

**El Paso Independent School District, Defendant.**

**No. EP–07–CV–00125–KC.**

United States District Court, W.D. Texas, El Paso Division.

July 14, 2008.

Joe Ruben Tanguma, Walsh, Anderson, Brown, Schulze & Aldridge, PC, for El Paso Independent School District.

Charles Mark Berry, Attorney at Law, El Paso, TX, for R.R., by his next friend of E.R. and Richard R., as next friend of R.R.

Colbert N. Coldwell, Guevara, Rebe, Bumann, Coldwell & Reedman, El Paso, TX, for Mark Berry.

### ORDER

KATHLEEN CARDONE, District Judge.

On this day, the Court considered Plaintiff R.R.'s "Motion for Summary Judgment," ("Motion"), Defendant El Paso Independent School District's "Response to Plaintiff's Motion for Summary Judgment" ("Response"), and Plaintiff R.R.'s "Reply to E.P.I.S.D[.]'s Opposition to Summary Judgment" ("Reply"). Having reviewed these submissions, the Court is of the opinion that Plaintiff R.R.'s Motion should be **GRANTED** in its entirety.

### I. BACKGROUND

The instant Motion arises from two distinct lawsuits. Initially, Defendant El Paso Independent School District ("EPISD") brought suit against Richard R., as next friend of R.R. ("RR"), and Plaintiff's attorney, Mark Berry ("Berry"), pursuant to the Individuals with Disabilities in Edu-

cation Act, 20 U.S.C. § 1400, *et seq.* ("IDEA"). Soon thereafter, RR filed his own IDEA suit, within which he named EPISD as Defendant.

The Court draws the following facts from the various pleadings submitted by both RR and EPISD. On September 26, 2006, RR, through his attorney, Berry, requested a due process hearing from the Texas Education Agency pursuant to 20 U.S.C. § 1415(b)(6). Def. RR's Mot. to Dismiss 1–2.[1] At the time of the request, RR was a 14–year–old student attending EPISD and suffering from Attention-deficit/hyperactivity disorder ("AD/HD"). Pl. EPISD's First Original Compl. 2. RR requested a hearing because EPISD allegedly violated the IDEA by: (1) failing to timely evaluate RR for special education services; (2) failing to provide RR with IDEA procedural safeguards; (3) failing to provide written notice of refusal to provide a special education referral; and (4) failing to comply with the "Child Find" provisions of the IDEA. Def. Berry's Mot. to Dismiss 9.

On October 11, 2006, during a resolution session, EPISD offered to: (1) conduct a full individual evaluation within sixty (60) days of the parents' consent to evaluate; (2) convene an Admission, Review, and Dismissal ("ARD") Committee meeting within thirty (30) calendar days from the completion of the evaluation; (3) continue to comply with the applicable federal and state laws regarding the provision of prior written notice to parents; (4) continue to

comply with the applicable federal and state laws regarding the provision of procedural safeguards to the parents; and (5) pay attorney's fees in the amount of $3,000.00. Pl. EPISD's First Original Compl. 2–3. RR and Berry refused this offer. *Id.* Furthermore, in September 2006, EPISD set up a Student Teacher Assessment Team ("STAT") committee[2] meeting to address RR's request for an evaluation. Administrative Record ("AR") Vol. I, 4. RR cancelled the meeting and sought instead to have the case decided by a Special Education Hearing Officer ("SEHO"). Pl. EPISD's First Original Compl. 3. On January 19, 2007, a SEHO for the State of Texas returned a decision in favor of RR on three of the four allegations. *Id.* at 4. The SEHO found that: (1) EPISD failed in its obligation to conduct a timely evaluation; (2) EPISD should have provided RR with a copy of the procedural safeguards as required by federal regulation; (3) EPISD failed to send RR the required written notification of its refusal to provide a special education referral; and (4) EPISD met its Child Find obligation. Def. Berry's Mot. to Dismiss 14.

On April 19, 2007, EPISD filed a complaint appealing the SEHO's decision and alleged that it was the prevailing party. Pl. EPISD's First Original Compl. 1. EPISD also alleged that the Court should grant EPISD attorney fees pursuant to 20 U.S.C. §§ 1415(i)(3)(B)(i)(II) and (III) because RR and Berry's suit was frivolous and brought for an improper purpose. *Id.*

---

1. Because the Motion to Dismiss pertained to cause number 07–CV–125, the pleadings related to it reverse the role of EPISD and R.R. as Plaintiff and Defendant.

2. In the words of the Special Education Hearing Officer ("SEHO") assigned to RR's case: The STAT [c]ommittee is a pre-referral committee that reviews student information, implements interventions to meet the student's needs, and documents the success

of the interventions. If the interventions are unsuccessful, the [c]ommittee should refer the student for a special education evaluation. The STAT handbook states that a "referral for evaluation for consideration of special education should be a last resort."

Administrative Record ("AR") Vol. I, 3 (citations omitted).

Conversely, on April 19, 2007, RR filed a complaint alleging that he was the prevailing party and entitled to attorney's fees. Pl. RR's Original Compl. 4.

On May 30, 2007, this Court consolidated both actions. Doc. No. 12.[3] On July 24, 2007, this Court granted RR and Berry's Motions to Dismiss as they related to EPISD's claim of attorney fees against them. Doc. No. 22. In so doing, the Court dismissed all claims against Berry as a Defendant. *Id.; see* Pl. EPISD's First Original Compl. 7–8. The Court did not, however, grant RR and Berry's Motions to Dismiss as to the right of EPISD to appeal. Court Order, Sept. 24, 2007. As a result, EPISD's appeal of the SEHO's decision remains active. Pl. EPISD's First Original Compl. 1.

Following a dispute over supplementing the administrative record for purposes of proceedings before this Court,[4] RR filed his Motion for Summary Judgment. Within the Motion, RR requests that the Court "render a judgment for plaintiff for all the relief set forth in [RR's] Original Complaint."[5] Pl. RR's Mot. for Summ. J. 1. Fundamentally, RR argues that he "is entitled to summary judgment based on the administrative record on file herein and on the declaration as to attorney's fees that are submitted herewith." *Id.* at 2.

Soon after RR entered his Motion, EPISD filed its Response, wherein EPISD articulates multiple theories opposing RR's Motion.[6] Subsequent to this Response, RR also filed a Reply to these arguments.[7]

The Court will now address the various argument of the parties in turn.

3. Later, by the Court's Order of March 31, 2008, the Court ordered not only that the cases be consolidated, but that all filings should be placed under cause number 07–CV–125. Upon the issuance of the Order, cause number 07–CV–126 was closed. Doc. No. 48.

4. Pursuant to the Court's Order of January 29, 2008, the submission of EPISD's additional witnesses and evidence was denied *in toto*. Doc. No. 47.

5. As outlined in RR's Original Complaint, he seeks four types of redress from the Court. First, he seeks an injunction to "[p]rovide prior written notice to [RR's] parents whenever [EPISD] proposes to initiate or change," or when EPISD "refuses to initiate or change, the identification, evaluation, or educational placement of [RR], or the provision of a free public education to [RR] as required by 20 U.S.C. § 1415(b)(3)." Pl. RR's Original Compl. 3. He also requests that the injunction "[p]rovide [RR]'s parents notice of procedural safeguards as required by 20 U.S.C. § 1415(d)(1)(A)(I)." *Id.* at 4. Second, he requests that the Court declare him "a prevailing party" and award him reasonable attorney fees, costs, and interest. *Id.* Third, he asks the Court to grant "costs, fees, and expenses for this action." *Id.* Fourth, RR requests "such other, further, and additional

relief as to the Court may seem just, proper, and appropriate." *Id.*

6. These arguments can be summarized thus: (1) that the mootness doctrine stripped the SEHO of jurisdiction; (2) RR's failure to exhaust his administrative remedies deprived the SEHO of jurisdiction; (3) a limitations bar prevents RR's claims prior to September 26, 2005; (4) a lack of alteration in the legal relationship between the parties prevents the grant of attorney fees; (5) RR is not a prevailing party entitled to attorney fees; (6) EPISD's settlement offers preclude the award of attorney fees under IDEA; (7) RR's needless protraction of the litigation justifies denial of attorney fees altogether; (8) RR's request for attorney fees is excessive, unreasonable, and fails to consider his attorney's lack of success; and finally, (9) that RR's request for an injunction should be denied for insufficient proffer of evidence. *See* Def. EPISD's Resp. 6–25.

7. In his Reply, RR argues the following: (1) that EPISD does not contest the reasonableness of RR's proposed attorney fees; (2) EPISD's proposed settlement was not enforceable; (3) the relief obtained by RR is indeed more favorable than the offer of settlement; and (4) RR's case is not mooted by EPISD's settlement offer. Pl. RR's Reply 1–4.

## II. DISCUSSION

### A. Standard

This case arises under the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 1400, *et seq.* Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A) (2006). To achieve this aim, the IDEA compels those states receiving federal funding to educate children with disabilities "to the maximum extent appropriate . . . . with children who are not disabled,"[8] and to do so "in the least restrictive environment consistent with their needs." *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 128 (5th Cir.1993) (citing *Sherri A.D. v. Kirby*, 975 F.2d 193, 207 n. 23 (5th Cir.1992) (explaining that least restrictive environment connotes "not only freedom from restraint, but the freedom of the child to associate with his or her family and able-bodied peers")). Although the FAPE that the IDEA demands of the states "need not be the best possible one, nor one that will maximize the child's educational potential," it must "be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him 'to benefit' from the instruction." *Cypress–Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 247 (5th Cir.1997) (quoting *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. Westchester County v. Rowley*, 458 U.S. 176, 188–89, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)).

■ Because the State of Texas receives federal education funding, all school districts within its borders must comply with the IDEA. *See Michael F.*, 118 F.3d at 247. To meet these strictures, the various school districts must provide each disabled student on their rolls with a FAPE. *Id.* The FAPE provided must be tailored to each disabled child's needs through an "individual educational program" ("IEP"), which is a written statement prepared at a meeting attended by a "qualified" and "knowledgeable" school district representative, a teacher, the child's parents or guardians, and, when appropriate, the child himself. *See* 20 U.S.C. § 1414(d)(1)(B). In Texas, the committee responsible for preparing an IEP is known as an Admissions, Review, and Dismissal Committee ("ARD Committee"). 19 TEX. ADMIN. CODE § 89.1050; *see Michael F.*, 118 F.3d at 247.

The IDEA further provides a "comprehensive system of procedural safeguards" designed to promote compliance with its mandates. *See Honig v. Doe*, 484 U.S. 305, 308, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988); *Rowley*, 458 U.S. at 205, 102 S.Ct. 3034 (explaining the "elaborate and highly specific procedural safeguards embodied in § 1415" of the IDEA); 20 U.S.C. § 1415 (outlining a series of detailed procedural safeguards). Among these safeguards, the parents of the disabled child must be provided with "[a]n opportunity to present a complaint . . . . with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child." 20 U.S.C. § 1415(b)(6). The IDEA also provides as follows:

> Whenever a complaint has been received under subsection (b)(6) . . . . of this section, the parents or the local educational agency involved in such complaint shall have an opportunity for an impartial due

8. 20 U.S.C. § 1412(a)(5).

process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency.

20 U.S.C. § 1415(f)(1)(A).

When a state allows for these hearings to be conducted by a local educational agency, the IDEA permits "any party aggrieved by the findings and decision rendered in such a hearing" to appeal to the state's educational agency, which must then conduct an "impartial review of such decision" and "make an independent decision upon completion of such review." 20 U.S.C. § 1415(g).

After exhausting state administrative remedies, an aggrieved party under the IDEA accrues "the right to bring a civil action .... in a district court of the United States, without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). Moreover, a party claiming entitlement to attorney fees under the IDEA may also file a claim in district court. 20 U.S.C. § 1415(i)(3). Nevertheless, these avenues to federal court are not without limitations. Indeed, Congress has limited the role of the judiciary under the IDEA, leaving the choice of educational policies and methods in the hands of state and local school officials. *See R.H. v. Plano Indep. Sch. Dist.*, No. 4:06cv352, 2008 WL 906289, at *2 (E.D.Tex. Mar.31, 2008) (citing *White ex. rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 377 (5th Cir.2003); *Flour Bluff Indep. Sch. Dist. v. Katherine M.*, 91 F.3d 689, 693 (5th Cir.1996)). The United States Supreme Court has stated as much, holding as follows:

> In assuring that the requirements of the [IDEA] have been met, courts must be careful to avoid imposing their view of

preferable educational methods upon the States. The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the [IDEA] to state and local educational agencies in cooperation with the parents or guardian of the child. The [IDEA] expressly charges States with the responsibility of "acquiring and disseminating to teachers and administrators of programs for handicapped children significant information derived from educational research, demonstration, and similar projects, and [of] adopting, where appropriate, promising educational practices and materials." § 1413(a)(3). In the face of such a clear statutory directive, it seems highly unlikely that Congress intended courts to overturn a State's choice of appropriate educational theories in a proceeding conducted pursuant to § 1415(e)(2).

*Rowley*, 458 U.S. at 207–08, 102 S.Ct. 3034. The Fifth Circuit has followed the Supreme Court's guidance, stating unequivocally that the judiciary's "role under the IDEA is purposefully limited." *White*, 343 F.3d at 377.

■ Therefore, while a federal district court's review of a SEHO's decision is "virtually *de novo*," [9] this by no means represents an invitation to "the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034. Instead, the district court should accord "due weight" to the SEHO's findings. *Adam J. ex. rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir.2003) (quoting *Teag-*

---

9. *Adam J. ex. rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir.2003) (quoting *Teague*, 999 F.2d at 131).

*ue,* 999 F.2d at 131). Operationally, the "due weight" standard calls upon the district court to receive the record of the administrative proceedings, to take additional evidence at the request of any party, and ultimately, to reach an independent decision based on a preponderance of the evidence. *See Houston Indep. Sch. Dist. v. Bobby R.,* 200 F.3d 341, 347 (5th Cir. 2000); *Michael F.,* 118 F.3d at 252.

In reaching its independent decision, a district court's inquiry is twofold. *Rowley,* 458 U.S. at 206, 102 S.Ct. 3034. First, the reviewing court must determine where the state has complied with the procedures as set forth in the IDEA. *Id.* Second, the district court must determine if the IEP developed through the IDEA's procedures is reasonably calculated to enable the child to receive educational benefits. *Id.* at 206–07, 102 S.Ct. 3034. Where these requirements have been met, Supreme Court precedent holds that "the obligations imposed by Congress and the courts can require no more." *Id.*

In the instant case, the Court has denied EPISD's efforts to submit additional evidence.[10] Consequently, with nothing new presented to the Court, RR's Motion for Summary Judgment simply becomes "the procedural vehicle for asking [this Court] to decide the case on the basis of the administrative record." *Heather S. v. State of Wis.,* 125 F.3d 1045, 1052 (7th Cir.1997) (quoting *Hunger v. Leininger,* 15 F.3d 664, 669 (7th Cir.1994)); *see also*

*R.H.,* 2008 WL 906289, at *3 (citations omitted) (holding that where "the parties concur that [there] is no need for additional evidence or discovery .... the Court will determine the merits of the case based on the administrative record"); *Austin Indep. Sch. Dist. v. Robert M.,* 168 F.Supp.2d 635, 638 (W.D.Tex.2001) (finding that where "no party to this proceeding .... requested the Court to hear additional evidence, a motion for summary judgment is simply a procedural vehicle for asking the Court to decide the case on the basis of the administrative record").

■ Despite being termed summary judgment, the district court must reach its decision based on the preponderance of the evidence. *Hunger,* 15 F.3d at 669. Procedurally, however, the text of the IDEA remains silent on the allocation of the burden of persuasion.[11] *Schaffer ex. rel. Schaffer v. Weast,* 546 U.S. 49, 56, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005). Thus, to offer guidance to the district courts, the Supreme Court has held that "[a]bsent some reason to believe that Congress intended otherwise .... the burden of persuasion [in an IDEA case] lies where it usually falls, upon the party seeking relief." *Id.* at 57–58, 126 S.Ct. 528. Nonetheless, because the Motion presently before the Court seeks to determine the rights of two separate, consolidated suits, wherein both parties seek separate relief, the issue of where the burden of persua-

---

**10.** After allowing EPISD to submit a proposed list of additional evidence and witnesses, the Court found as follows:

> [N]either the exhibits nor the witnesses present *competent evidence to supplement* the administrative record. To the contrary, both represent rebuttal evidence to [RR] and Berry's request for attorney fees. Such evidence has a defined point of entry in the pleading time line of the Western District of Texas, which this Court will not deviate

from. As a consequence, the Court must deny, in its entirety, the admission of EPISD's proposed exhibits.

Court Order, Jan. 29, 2008, 536 F.Supp.2d 701, 710.

**11.** Because the Court will decide this case based solely on the administrative record, there exists no burden of production. *See Schaffer ex. rel. Schaffer v. Weast,* 546 U.S. 49, 56, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005).

sion should fall presents an issue of first impression.

### 1. Standard for a consolidated IDEA case

The present action involves two separate claims under the IDEA. EPISD has exercised its right to district court review of the SEHO's decision. *See* 20 U.S.C. § 1415(i)(2)(A). RR has invoked the right to seek attorney fees as a prevailing party under the IDEA. *See* 20 U.S.C. § 1415(i)(3). Now, having consolidated both these causes of action into the same case, RR seeks a summary adjudication of his entitlement to attorney fees, which necessarily involves a finding by this Court as to whether he is a prevailing party under the IDEA.[12] Plainly stated, RR's entitlement to attorney fees remains contingent on a favorable review of the SEHO's decision.

The Court finds that the only logical way to dispose of these countervailing claims is to first complete its review of the SEHO's decision. Under normal conditions, a district court may grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c) (2008); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Warfield v. Byron,* 436 F.3d 551, 557 (5th Cir.2006). The statutory framework of the IDEA, however, narrows the district court's ability to take on evidence from the "pleadings, the discovery and disclosure materials on file, and any affidavits" allowed by Rule 56(c) down to "the records of the administrative proceedings" and "additional evidence at the request of a party." *See* 20 U.S.C. § 1415(i)(2)(C).

■ In addition, the weight of extant case law acts to limit the IDEA's additional evidence provision and place the entry of additional evidence within the discretion of the district court.[13] Therefore, when the district court has disallowed additional evidence, as it has in the instant case, the case most resembles a traditional review of an administrative decision, wherein "[i]t is a bedrock principle of judicial review that a court reviewing an agency decision should not go outside of the administrative record." *Goonsuwan v. Ashcroft,* 252 F.3d 383, 391 n. 15 (5th Cir.2001) (citing *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)).

■ For the purposes of the instant

---

12. Under the IDEA, the Court may *only* grant attorney fees to a "prevailing party." 20 U.S.C. § 1415(i)(3)(B)(i).

13. Although the Fifth Circuit has yet to delineate the contours of the IDEA's additional evidence provision, a number of other courts have already decided this issue. The First Circuit, the Eighth Circuit, the Ninth Circuit, and the Eleventh Circuit utilize the *Burlington* standard in determining the extent of record supplementation allowed under the IDEA's additional evidence provision. *Town of Burlington v. Dep't of Educ.,* 736 F.2d 773, 790 (1st Cir.1984); *see Indep. Sch. Dist. No. 283 v. S.D. ex rel. J.D.,* 88 F.3d 556, 561 (8th Cir.1996) (citing to First Circuit precedent and stating that parties need "solid justification" for supplementing the administrative record); *Ojai Unified Sch. Dist. v. Jackson,* 4 F.3d 1467, 1472–73 (9th Cir.1993) (stating that "additional" evidence means supplemental and does not authorize witnesses at trial to repeat or embellish their prior administrative testimony); *Walker County Sch. Dist. v. Bennett ex rel. Bennett,* 203 F.3d 1293, 1299 (11th Cir.2000) (construing "additional" in the ordinary sense of the word and holding that the IDEA additional evidence provision does not authorize witnesses at trial to repeat or embellish their prior administrative hearing testimony).

administrative review,[14] EPISD has contested the SEHO's decision. Thus, while granting due weight to the SEHO's decision, Supreme Court precedent also directs this Court to place the burden of persuasion upon EPISD as the challenging party.[15] Following this "virtually de novo" review,[16] the Court can then turn to the issue of who, as a prevailing party, may make a claim for attorney fees under the IDEA.

### B. Analysis

Combining EPISD's First Original Complaint and its Response to RR's Motion for Summary Judgment, the Court discerns five direct challenges to the SEHO's decision.

First, EPISD argues that the SEHO "erred as a matter of law in allowing [RR] to proceed with [his] request for a due process hearing and refusing to dismiss the complaint based on ripeness, standing and mootness." Pl. EPISD's First Original Compl. 6. Second, EPISD avers that the SEHO should have dismissed RR's action due to RR's failure to exhaust his administrative remedies. *Id.*; Def. EPISD's Resp. 8–10. Third, it posits that a limitations bar precludes RR's claims before September 26, 2005. Def. EPISD's Resp. 10–14. Fourth, EPISD postulates that the SEHO's "determination and factual findings that [EPISD] never provided notice of its refusal to evaluate [RR], nor provided a copy of the procedural safeguards to the parents is legally erroneous." Pl. EPISD's First Original Compl. 6. Fifth, it argues that the SEHO's "determination and factual findings that [EPISD] violated .... its Child Find[17] obligations by failing to identify [RR] or provide for an evaluation in 2005 is legally erroneous, contradictory, and unsupported by a preponderance of the evidence." *Id.*[18]

Although EPISD also presents several challenges to the award of attorney fees to RR, the Court reiterates that such arguments have a "defined point of entry in the pleading time line of the Western District

---

14. The Court has no desire to depict all IDEA appeals as simple matters of administrative review. In fact, the unique processes, statutory framework, and standard of review in IDEA cases precludes such categorization. Nonetheless, where no additional evidence will be presented to create an issue of material fact, a motion for summary judgment under the IDEA simply functions to trigger the Court's review of the administrative record. *See Heather S.*, 125 F.3d at 1052 (citations omitted).

15. Generally, the party seeking relief under the IDEA bears the burden of persuasion. *Schaffer*, 546 U.S. at 57–58, 126 S.Ct. 528 (holding that "the burden of persuasion [in an IDEA case] lies where it usually falls, upon the party seeking relief"). Furthermore, the party challenging the outcome of a SEHO's decision bears the burden of *proof*. *Heather S.*, 125 F.3d at 1052 (citations omitted); *see Salley v. St. Tammany Parish Sch. Bd.*, 57 F.3d 458, 467 (5th Cir.1995); *Michael F.*, 118 F.3d at 248; *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir.1990); *Karl ex. rel. Karl v. Bd. of Educ. Of Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 877 (2d Cir.1984). Under these precedents, EPISD clearly bears the burden of demonstrating error in the SEHO's decision.

16. *See Adam J.*, 328 F.3d at 808.

17. Child Find refers to the requirement that states identify, locate, and evaluate children with disabilities and develop practical methods "to determine which children with disabilities are currently receiving needed special education and related services." *See* 20 U.S.C. § 1412(a)(3)(A); 34 C.F.R. § 300.111 (2006).

18. This argument incorporates EPISD's argument that the SEHO erred in finding that EPISD "should have referred [RR] for special education testing is erroneous and unsupported by a preponderance of the evidence." Pl. EPISD's First Original Compl. 6.

of Texas, which this Court will not deviate from." [19] Court Order, Jan. 29, 2008, 536 F.Supp.2d at 710. In keeping with this time line, the Court will do no more at this juncture with attorney fees than determine a prevailing party. Recognizing these limitations, the Court will limit the present order to a review of the merits of the SEHO's decision. To that end, the Court will address each of EPISD's direct objections in turn.

### 1. The SEHO did not err as a matter of law by refusing to dismiss RR's complaint based on the doctrines of ripeness, standing, and mootness

In its Complaint, EPISD asks this Court to overturn the SEHO's decision based on the doctrines of ripeness, standing, and mootness. Pl. EPISD's First Original Compl. 6. These arguments, however, did not originate before this Court. Rather, EPISD formulated and introduced these arguments before the SEHO to no avail. AR Vol. I, 178–83. Now, facing RR's Motion for Summary Judgment, EPISD has chosen only to support its position on the issue of mootness. Because EPISD has not substantiated its arguments concerning standing and ripeness, this Court would be within its discretion to disregard these two challenges altogether. *See Smith ex rel. Estate of Smith v. United States,* 391 F.3d 621, 625 (5th Cir.2004) (citing *Malacara v. Garber,* 353 F.3d 393, 405 (5th Cir.2003) (holding "that 'when evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court' ")); *Sko-*

*tak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 (5th Cir.1992). Nevertheless, in the interests of adjudicating all claims in this case, the Court will address all three challenges, while only scrutinizing the challenge premised upon the doctrine of mootness.

#### a. Standing

■■■■ Supreme Court jurisprudence holds that standing consists of three "irreducible constitutional minimum[s]." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351. To wit, "a litigant must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Massachusetts v. E.P.A.,* 549 U.S. 497, 127 S.Ct. 1438, 1453, 167 L.Ed.2d 248 (2007) (citing *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130). As follows in this Order, the Court finds that RR suffered an actual, particularized injury traceable to EPISD, and that this Order, in fact, redresses that injury. Thus, EPISD's argument that RR lacked standing fails.

#### b. Ripeness

■■■■ As to ripeness, the Supreme Court has explained that whether a controversy is "ripe" for judicial resolution has a "twofold aspect, requiring [a court] to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior,* 538 U.S. 803, 814, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003) (quoting

---

**19.** The Local Rules of the Western District of Texas incorporate a precise approach to determining awards of attorney fees. In pertinent part, Local Rule CV–7(i) states that "[a]ll motions for an award of attorney's fees shall be filed and served no later than fourteen (14) days after entry of judgment pursuant to Rule 54 of the Federal Rules of Civil Procedure." W.D. Tex. Loc. R. CV–7(i).

*Abbott Labs. v. Gardner,* 387 U.S. 136, 148–149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). The fundamental premise behind the ripeness doctrine "is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements," when those "disagreements" are premised on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Reno v. Catholic Soc. Servs.,* 509 U.S. 43, 72, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993) (quoting *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 580–581, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985)). There is no abstraction or contingency to determining whether EPISD violated its obligations under the IDEA in this case. Federal statutes and case law make the adjudication of this matter quite concrete. Moreover, delaying judicial review of this matter could affect RR's ability to receive a FAPE. Hence, the Court cannot agree with EPISD's contention that RR's claims are not ripe for determination.

### c. Mootness

Additionally, EPISD contends that the SEHO "erred in refusing to dismiss Plaintiff's request as moot." Def. EPISD's Resp. 6. Further, EPISD argues that "the doctrine of mootness deprived [both] the [SEHO] and this Court of jurisdiction." *Id.* To bolster this argument, EPISD highlights that the SEHO's findings of fact, which RR "expressly adopted, conclusively establish that EPISD was ready, willing, and able to provide the relief Plaintiff requested .... prior to Plaintiff's request for a due process hearing." *Id.* (emphasis omitted). Put another way, EPISD argues that "[b]ut for Plaintiff's refusal to accept the very relief requested, there was no live controversy for the [SEHO] to preside over in a due process hearing."

*Id.* at 7. As a consequence, EPISD urges the Court to deny RR's Motion for Summary Judgment[20] and to overturn the SEHO's conclusions of law and findings of fact. Pl. EPISD's First Original Compl. 8.

In response, RR questions what EPISD claims could have mooted the case. Specifically, RR states that the settlement proposed by EPISD lacked force in either state or federal court. Pl. RR's Reply 2. According to RR, private settlements entered into as a resolution to claims filed under 20 U.S.C. § 1415(b)(6) generally "do not confer prevailing party status on the parent and thus the federal court has no continuing jurisdiction to enforce such settlement." *Id.* (citing *T.D. v. LaGrange Sch. Dist. No. 102,* 349 F.3d 469, 479 (7th Cir.2003) (holding that "[t]he settlement agreement in this case does not bear any of the marks of a consent decree .... [t]here must be some official judicial approval of the settlement and some level of continuing judicial oversight")). As outlined by RR, the only exceptions to this lack of force in federal court arise when a settlement is reached either through the statutory mediation process or at a resolution session between the parents and the IEP team. *Id.* (citing 20 U.S.C. §§ 1415(e)(2)(F), 1415(f)(1)(B)(iii)). With regard to Texas law, RR describes the impotence of private agreements by citing to Texas Supreme Court precedent holding that the immunity of the State and its political subdivisions "is waived only by clear and unambiguous language." *Id.* (citing *Tooke v. City of Mexia,* 197 S.W.3d 325, 328–29 (Tex.2006)); *see* Tex. Gov't Code Ann. § 311.034 (stating that "[i]n order to preserve the legislature's interest in managing state fiscal matters through the appropriations process, a statute shall not be construed as a waiver of sovereign

---

20. Def. EPISD's Resp. 8.

immunity unless the waiver is effected by clear and unambiguous language"). Based upon this precedent and RR's claim that EPISD's settlement offer "states that there was no agreement at the resolution session and there is no mediation alleged," RR postulates that EPISD's settlement offer, "had it been accepted, was unenforceable." Pl. RR's Reply 2.

Under the doctrine of mootness, "[a] controversy becomes moot where, as a result of intervening circumstances, there are no longer adverse parties with sufficient legal interests to maintain the litigation." *Chevron U.S.A., Inc., v. Traillour Oil Co.,* 987 F.2d 1138, 1153 (5th Cir.1993) (citing *Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293 (1859)). Or, plainly stated, "a moot case presents no Article III case or controversy, and a court has no constitutional jurisdiction to resolve the issues it presents." *Goldin v. Bartholow,* 166 F.3d 710, 718 (5th Cir.1999).

Thus, to ascertain whether the doctrine of mootness has acted to deprive either the SEHO or this Court of jurisdiction, the Court must determine whether the controversy between RR and EPISD remained live at the time RR requested a due process hearing. Were this Court to find that the controversy between the parties had been mooted, EPISD correctly asserts that the Court would neither possess the jurisdiction to "make a determination on the merits or order a consent decree that could render a part a 'prevailing party' for purposes of an award of attorney fees." *District of Columbia v. Jeppsen ex rel. M.J.,* 468 F.Supp.2d 107, 113 (D.D.C.2006) (citations omitted). Based upon the evidence presented, however, the Court finds no grounds to make such a finding.

To the contrary, the Court finds that a live controversy did and does exist between the parties to this suit. The Court reaches this conclusion for two reasons. First, regardless of EPISD's attempt to resolve the parties' dispute prior to the due process hearing, the record clearly demonstrates that EPISD offered nothing more than "a private settlement" to RR. Def. EPISD's Resp. Ex A at 1. As such, RR would not qualify as a prevailing party under the statutory framework of the IDEA, nor would he be statutorily entitled to attorney fees.

### i. Prevailing party status

The Fifth Circuit has ruled definitively on the subject of prevailing party status. In *Walker v. City of Mesquite, Texas,* the Fifth Circuit analyzed Supreme Court precedent on prevailing party status under 42 U.S.C. § 1983 and explained as follows:

> To qualify as a prevailing party, the plaintiff must (1) obtain actual relief, such as an enforceable judgment or a consent decree; (2) that materially alters the legal relationship between the parties; and (3) modifies the defendant's behavior in a way that directly benefits the plaintiff at the time of the judgment or settlement. *Farrar v. Hobby,* 506 U.S. 103, 111–12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). Most recently, in *Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Resources,* the Court reaffirmed that both judgments on the merits and settlement agreements enforced through consent decrees were sufficient to create a prevailing party. 532 U.S. 598, 604, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). Again, the Court stated that the awarded relief for which fees were sought must materially alter the "legal relationship of the parties." *Id.* (citing *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489

U.S. 782, 792–93, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989)).

*Walker v. City of Mesquite, Tex.*, 313 F.3d 246, 249 (5th Cir.2002) (citations altered for clarity).

Other circuits have echoed this reading of *Buckhannon* in the IDEA context.[21] The Seventh Circuit summarized the meaning and effect of *Buckhannon* as follows:

> In *Buckhannon,* the Supreme Court limited the meaning of the term 'prevailing party,' by rejecting the catalyst theory as a method of attaining prevailing-party status under the Americans With Disabilities Act ('ADA') and Fair Housing Amendments Act ('FHAA'). *Buckhannon,* 532 U.S. at 605, 121 S.Ct. 1835. Under the catalyst theory, which had been accepted by many courts before *Buckhannon,* a plaintiff could prevail, if the plaintiff's suit was a catalyst that prompted the change that the plaintiff sought. *Buckhannon,* however, held that a party could not be a prevailing party without receiving some sort of 'judicial imprimatur' on the charge. *Id.* Central to the Court's conclusion was its finding that the term 'prevailing party' was 'a legal term of art,' which signified that the party that had been granted relief by a court. *Id.* at 603, 121 S.Ct. 1835. As examples of the type of relief necessary to attain 'prevailing party' status, the court cited a judgment on the merits and a consent decree. *Id.* at 604, 121 S.Ct. 1835.

*T.D. v. LaGrange Sch. Dist. No. 102,* 349 F.3d 469, 474 (7th Cir.2003) (citations altered for clarity).

Similarly, the Third Circuit has reasoned that "[a]lthough a party benefiting [sic] from a settlement agreement could be a prevailing party, the change in the legal relationship must be in some way judicially sanctioned." *John T. ex rel. Paul T. v. Del. County Intermediate Unit,* 318 F.3d 545, 556 (3d Cir.2003) (citing *Buckhannon,* 532 U.S. at 605, 121 S.Ct. 1835). The Third Circuit went on to find judicial imprimatur where a stipulated settlement "(1) contained mandatory language; (2) was entitled 'Order;' (3) bore the signature of the District Court judge; and (4) provided for judicial enforcement." *Id.* at 558. Thus, under the holding of *Buckhannon* and the developing case law of the circuit courts, no litigant may claim prevailing party status without securing a decree or settlement bearing "judicial imprimatur." *Buckhannon,* 532 U.S. at 605, 121 S.Ct. 1835.

The private settlement extended by EPISD to RR fails to meet this criterion. The face of the settlement plainly states that EPISD was willing only to offer a "private settlement," and moreover, that EPISD was not willing to negotiate an agreed or consent order. Def. EPISD's Resp. Ex A at 1. Consequently, RR would have been denied prevailing party status and the entitlement to attorney fees which this status confers.

---

**21.** The Seventh Circuit has spoken clearly on the applicability of *Buckhannon* to not only the IDEA, but all fee-shifting statutes. In a 2003 decision, the court held:

> We reiterate, however, that because 'prevailing party' is a legal term of art that is interpreted consistently across fee-shifting statutes, there is a strong presumption that *Buckhannon* applies to each fee-shifting statute that awards fees to 'prevailing parties.' Consequently, for this Court to find that *Buckhannon* does not apply to the IDEA, a 'prevailing party' fee-shifting statute, the 'text, structure, or legislative history' would have to clearly indicate that in the IDEA, Congress did not intend to use the term 'prevailing party' in its traditional 'term of art' sense.

> *T.D. v. LaGrange Sch. Dist. No. 102,* 349 F.3d 469, 475 (7th Cir.2003).

Standing alone, the preclusion of prevailing party status and attorney fees to RR would not serve to maintain a live case or controversy between the parties. Indeed, EPISD aptly references Supreme Court precedent that an "interest in attorney's fees is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 480, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990) (citing *Diamond v. Charles*, 476 U.S. 54, 70–71, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986)). Were RR's only continuing interest that of attorney fees, the doctrine of mootness would estop both the SEHO's decision and review by this Court. In this case, however, RR pressed forward with litigation to achieve not only attorney fees, but more importantly, *enforceability* of a settlement award. By proceeding in this fashion, RR followed the weight of current case law, which holds that the private settlement offered by EPISD would have lacked force in either federal or state court.

### ii. RR's interest in a pathway to the federal courts

■ Along with defining the contours of "prevailing party" status, the *Buckhannon* decision also directs this Court as to when a federal court may enforce a settlement award. The *Buckhannon* Court spoke directly to the subject, holding first that "[p]rivate settlements do not entail the judicial approval and oversight involved in consent decrees." *Buckhannon*, 532 U.S. at 604 n. 7, 121 S.Ct. 1835. Because private settlements lack the judicial imprimatur required for enforcement, the Court held that "federal jurisdiction to enforce a private contractual settlement will often be lacking unless the terms of the agreement are incorporated into the order of dismissal." *Id.* (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) (holding that neither the Federal Rules of Civil Procedure nor any law provides for jurisdiction of a federal court over disputes arising out of an agreement that produces a stipulation, and further, that enforcement of a settlement requires its own basis for jurisdiction)). Therefore, without incorporation into an order of dismissal, a party seeking to enforce the terms of a settlement agreement would have to produce an independent jurisdictional basis to return to the same federal court that originally heard the case.

Here, EPISD admits that it rejected any negotiation of an agreed or consent order. Def. EPISD's Resp. Ex. A. Moreover, the private agreement that EPISD did offer to RR would have neither entered the record nor borne the judicial imprimatur necessary to enforce the award in federal court. For EPISD to then allege, as it does, that this private agreement somehow mooted the dispute between the parties is to propound the argument that RR harbored no interest in the enforceability of the settlement agreement. Yet, to do so ignores the value of the IDEA's pathway to the federal courts.

■ Generally, the State of Texas and its political subdivisions possess immunity from being haled into federal court by suits authorized by federal law. *See N. Ins. Co. of N.Y. v. Chatham County, Ga.*, 547 U.S. 189, 193, 126 S.Ct. 1689, 164 L.Ed.2d 367 (2006). That immunity, however, is not absolute. First, Congress may abrogate a state's immunity from suit when it acts under section five of the Enforcement Clause of the Fourteenth Amendment. *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 277 (5th Cir.2005) (en banc) (citing U.S. CONST. amend. XIV, § 5 ("The Congress shall have power to enforce, by appropriate legislation, the provi-

sions of this article.")). Second, a state may consent to suit in federal court. *Id.*

■ Congress made specific provision within the IDEA to condition "a state's receipt of federal IDEA funds on its consent to suit under that Act." *Id.* at 280.[22] Thus, under the IDEA, an individual may hale a school district, as a subdivision of the state, into federal court. *Id.* at 289.

Clearly, then, the IDEA offers individuals recourse to sue a state in federal court. The private agreement proposed by EPISD, however, would have done the opposite. In fact, by signing the agreement, RR would have surrendered his pathway to the federal courts and relied entirely on EPISD's faithful execution of the agreement. Had a breach occurred, the agreement would have left RR bereft of any recourse to hale EPISD into federal court.

### iii. RR's interest in the enforceability of an agreement in Texas state court

■ The plain language of the Texas statutes and Texas Supreme Court precedent would have stripped RR of the ability to enforce EPISD's private agreement in the state court system as well. Under Texas law, sovereign immunity exists to "protect the State and its political subdivisions from lawsuits and liability for money damages." *Mission Consol. Indep. Sch. Dist. v. Garcia,* 253 S.W.3d 653, 655 (Tex.

2008). This immunity, although often referred to under the umbrella term of "sovereign immunity," actually consists of the distinct concepts of "sovereign immunity" and "governmental immunity." *Wichita Falls State Hosp. v. Taylor,* 106 S.W.3d 692, 694 n. 3 (Tex.2003). The term "sovereign immunity" refers to a state's immunity from suit and liability. *Id.* Sovereign immunity extends not only to the state, but also to the varying divisions of state government, including agencies, boards, hospitals, and universities. *Id.* (citing *Lowe v. Tex. Tech Univ.,* 540 S.W.2d 297, 298 (Tex. 1976)). "Governmental immunity" protects political subdivisions of the state, including municipalities and school districts. *Harris County v. Sykes,* 136 S.W.3d 635, 638 (Tex. 2004). Both sovereign and governmental immunity deprive the Texas courts of subject matter jurisdiction. *See Reata Const. Corp. v. City of Dallas,* 197 S.W.3d 371, 374 (Tex.2006); *Dallas Area Rapid Transit v. Whitley,* 104 S.W.3d 540, 542 (Tex. 2003).

■ Governmental immunity, such as that which protects EPISD, has two components: immunity from liability and immunity from suit. *Tooke,* 197 S.W.3d at 332. Immunity from suit bars suit against the entity altogether. *Id.* Immunity from suit takes on particular relevance when a governmental entity enters into a contract, because that entity waives immunity from

---

**22.** The IDEA, at 20 U.S.C. § 1403(a), states that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from suit in Federal court for a violation of this chapter." The Fifth Circuit has explained that this language sought to correct the deficiencies in the language of the IDEA's predecessor, the Education of the Handicapped Act. The Supreme Court ruled that the language of that Act "lacked a sufficiently clear statement of Congressional intent to abrogate Eleventh Amendment immunity to claims under the statute." *Pace v. Bogalusa City Sch. Bd.,* 403 F.3d 272, 280 n. 31 (5th Cir.2005) (en banc) (citing *Dellmuth v. Muth,* 491 U.S. 223, 232, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989)). Because the IDEA's predecessor neither clearly abrogated the states' immunity nor explicitly demanded consent, Congress redesigned the IDEA in such as a way as to overtly require states to consent to suit in order to receive federal education funding. The Fifth Circuit has "consistently interpreted Supreme Court guidance as permitting such conditional spending programs, as has every other circuit that has squarely addressed the issue." *Id.* at 285 (citations omitted).

liability and voluntarily binds itself, just as any other party would, to the terms of the contract. *Id.* Nevertheless, that entity *does not* thereby waive immunity from suit. *Id.* For there to be a waiver of immunity from suit in the contract-claim context, the Texas legislature must have waived immunity from suit as to the claim in question by clear and unambiguous language. *Id.* at 332–33 (requiring clear and unambiguous language to waive governmental immunity); *see* TEX. GOV'T CODE ANN. § 311.034 (Vernon 2007) ("In order to preserve the legislature's interest in managing state fiscal matters through the appropriations process, a statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language.").

The Texas Local Government Code ("TLGC") enumerates which entities can be considered "local government entities" for purposes of Texas law. *See* TEX. LOC. GOV'T CODE ANN. § 271.151 (Vernon 2005). In addition, the TLGC articulates when those local government entities-including school districts [23]—waive their governmental immunity from suit. *See id.* § 271.152. By a 2005 amendment, the Texas legislature announced that local governmental entities would be amenable to contract-related claims in the following situation:

> A local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating [24] a claim for

breach of the contract, subject to the terms and conditions of this subchapter. *Id.*

A contract, within the meaning of this subchapter, is defined as "a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity." *Id.* § 271.151(2).

Thus, to determine whether the legislature has waived a local governmental entity's immunity from suit, Texas courts have focused on whether goods or services are being provided to the local government entity. In those cases where immunity has been waived, the courts have concluded that the contract between the parties called for some receipt of goods or services by the local governmental entity. *See Ben Bolt–Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Political Subdivisions/Cas. Joint Self–Ins. Fund,* 212 S.W.3d 320, 327 (Tex.2006) (holding that the state's self-insurance fund was amenable to suit because it received services from the school districts, which helped elect the members of its board); *Clear Lake City Water Auth. v. Friendswood Dev. Co.,* 256 S.W.3d 735, 740 (Tex.App.2008) (finding that an agreement to hire third parties to build streets, roads, and bridges for a local government entity constituted sufficient provision of services to waive immunity). Conversely, the Texas courts have refused to waive immunity when the local government entity has not received goods and services. *See Somerset Indep. Sch. Dist. v. Casias,* No. 04–07–00829–CV, 2008 WL 1805533, at *2 (Tex.App. Apr. 23, 2008) (finding that a

---

**23.** Texas law declares school districts to be local governmental entities. *See* TEX. LOC. GOV'T CODE ANN. § 271.151(3) (Vernon 2005).

**24.** "Adjudication" of a claim is defined as "the bringing of a civil suit and prosecution to final judgment in county or state court and

includes the bringing of an authorized arbitration proceeding and prosecution to final resolution in accordance with any mandatory procedures established in the contract subject to this subchapter for the arbitration proceedings." *Id.* § 271.151(1).

breach of contract claim filed under section 271.152 did not waive school district's immunity, because the earnest money contract at issue related to the sale of land rather than goods or services); *City of San Antonio v. Reed S. Lehman Grain, Ltd.*, No. 04–04–00930–CV, 2007 WL 752197, at *2 (Tex.App. Mar.14, 2007) (noting that an easement dedication contract conveyed only an interest in real property, and as such, is not an agreement for providing goods and services that would waive immunity). Hence, to divest a school district of its immunity from suit, a party seeking to file suit would have to show that they had provided some good or service to the district.

RR could make no such showing. In essence, therefore, EPISD offered RR an agreement without the concomitant right to enforce it. This Court finds that the interest in that enforceability constitutes an interest sufficient, for the purposes of litigation, to create a live case or controversy. Furthermore, because the private settlement extended by EPISD simultaneously (1) denied RR prevailing party status under the IDEA and (2) precluded RR's ability to enforce the agreement in either the federal or state courts, the Court finds that a live case or controversy did and does exist between the parties to this suit.

### 2. Because RR properly exhausted his administrative remedies, both the SEHO and this Court possess jurisdiction

Next, EPISD argues that neither the SEHO nor this Court possess jurisdiction over this matter, as RR failed to exhaust his administrative remedies. Pl. EPISD's First Original Compl. 6; Def. EPISD's Resp. 8–10. EPISD insists that the SEHO's findings of fact "conclusively establish that the [SEHO] lacked jurisdiction to permit [RR] to proceed with a due process hearing." Def. EPISD's Resp. 8–9 (citing AR Vol. I, 7). EPISD recounts the SEHO's finding that "before [RR] requested a due process hearing, [EPISD] was prepared to begin the evaluation process and had scheduled a STAT meeting to address the parent's request for a [Full Individual Evaluation ("FIE")] and obtain the parent's consent for the initial evaluation." *Id.* at 9. Nonetheless, EPISD highlights that RR's parents failed to provide consent. *Id.* Additionally, RR's parents later cancelled the STAT meeting. *Id.* As a consequence, EPISD argues that if RR had participated in the STAT meeting, rather than cancelling and filing for a due process hearing, "there would have been nothing left for the [SEHO] to do since the relief [granted by the SEHO] .... was the precise conduct the STAT committee was prepared to undertake." *Id.*

RR fails to address the argument in his Reply. Based upon the argument submitted by EPISD, the question the Court must determine is whether RR failed to exhaust his administrative remedies when he cancelled the STAT meeting provided by EPISD in favor of submitting his claims to the state-level SEHO.

The IDEA secures to every student in the State of Texas the right to a FAPE, which must be tailored to each disabled child's needs through an IEP. *See* 20 U.S.C. § 1414(d)(1)(B). These IEPs, in turn, are to be crafted, in writing, at a meeting attended by a "qualified" and "knowledgeable" school district representative, a teacher, the child's parents or guardians, and, when appropriate, the child himself. *Id.* Whenever parents have complaints about the FAPE provided by a school district, the IDEA provides that they "shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational

agency or by the local educational agency, as determined by State law or by the State educational agency." 20 U.S.C. § 1415(f)(1)(A).[25]

Procedurally, parents must first address their concerns about a child's FAPE to the local school district, but if the school district has not resolved the complaint "to the satisfaction of the parents" within thirty (30) days, then the "due process hearing may occur." 20 U.S.C. § 1415(f)(1)(B)(ii).[26] Although the IDEA provides that the states may elect to administer due process hearings at either the state or local level,[27] the State of Texas has charged the Texas Education Agency ("TEA") with responsibility for implementing "a *one-tier system* of due process hearings under the IDEA." 19 Tex. Admin. Code § 89.1151(b) (emphasis added). Thus, in those instances where a school district fails to resolve a parent's complaint within thirty (30) days, parents have a direct and exclusive pathway to a due process hearing administered by the Texas Education Agency. Additionally, should the parents remain dissatisfied following the due process hearing officer's decision, they may file a civil action in state or federal district court. *See* 20 U.S.C. § 1415(i)(2)(A).

■■■ A complaint brought before a federal district court based on the IDEA is not a justiciable controversy until Plaintiffs have exhausted their administrative reme-

dies under the IDEA or proved that exhaustion would be futile or inadequate.[28] *Gardner v. Sch. Bd. Caddo Parish,* 958 F.2d 108, 112 (5th Cir.1992); *see* 20 U.S.C. § 1415(i)(2)(A). To exhaust administrative remedies in the State of Texas, the IDEA and Texas Administrative Code demand only that a plaintiff undergo a due process hearing administered by the TEA. *See* 20 U.S.C. § 1415(i)(2)(A); 19 Tex. Admin. Code § 89.1151(b). The relevant law contemplates neither a hearing preceding a plaintiff's path to the TEA due process hearing, nor any hearing between the TEA and a plaintiff's access to the federal courts.

■■■ Based upon the plain language of the IDEA and the Texas Administrative Code, the Court finds that RR properly exhausted all necessary administrative remedies. Although EPISD would have this Court interpret the Tenth Circuit's decision in *Ellenberg v. New Mexico Military Institute* as imposing new procedural requirements upon RR, the unique facts of *Ellenberg* mitigate against this Court transposing that expansive holding into the case at bar. *See generally Ellenberg v. New Mexico Military Institute,* 478 F.3d 1262 (10th Cir.2007).

### a. The *Ellenberg* decision

In *Ellenberg,* plaintiffs claimed that New Mexico Military Institute ("NMMI") vio-

---

**25.** The IDEA secures to school districts this same path to the federal courts. *See* 20 U.S.C. § 1415(f)(1)(A).

**26.** Before proceeding to the due process hearing, however, the IDEA does demand that the parties undertake additional measures. Among these, within fifteen (15) days of receiving a complaint, the local educational agency must convene a meeting with the parents and the relevant members of the IEP team to discuss and potentially resolve the complaint. *See* 20 U.S.C. § 1415(f)(1)(B). The parties may only forgo this requirement through a written waiver or participation in

the mediation process outlined by the IDEA. *See* 20 U.S.C. § 1415(f)(1)(B)(i)(IV). None of these requirements are at issue in the current litigation.

**27.** *See* 20 U.S.C. § 1415(f)(1)(A).

**28.** In those instances where it is claimed, plaintiffs bear the burden of demonstrating the futility or inadequacy of administrative review. *Gardner v. Sch. Bd. Caddo Parish,* 958 F.2d 108, 112 (5th Cir.1992) (citing *Honig,* 484 U.S. at 327, 108 S.Ct. 592).

lated the IDEA, the Americans with Disabilities Act ("ADA") and the Rehabilitation Act by denying their disabled child entrance to the school. *Id.* at 1273. Although both parents initiated the cause as plaintiffs, the case began when Mr. Ellenberg brought his daughter, S.E., from Ms. Ellenberg's home in Florida to live with him in New Mexico. *Id.* at 1271. Shortly after the move, in 2000, Mr. Ellenberg enrolled his daughter in Los Alamos High School. *Id.* After two years of substantial behavioral problems, the Taos Municipal School District ("TMSD") prepared an IEP for S.E. stating that she required a small, structured learning environment and careful monitoring. *Id.* at 1272. The IEP developed by TMSD was to be reviewed one year from the date it was created or at the time of her discharge, whichever occurred first. *Id.*

The following year, rather than reapplying to TMSD for a renewal or review of her IEP, plaintiffs submitted S.E.'s application directly to NMMI, a military school outside TMSD's borders. *Id.* Owing in no small part to plaintiffs' disclosure of S.E.'s history of disciplinary problems, participation in a residential treatment program in Taos, and her diagnosis and related medication for Oppositional Defiance Disorder, NMMI denied her admission for the fall semester. Shortly thereafter, plaintiffs petitioned the State of New Mexico for a due process hearing against NMMI, claiming that NMMI's refusal to provide S.E. with a FAPE violated her rights under the IDEA and section 504 of the Rehabilitation Act.[29] *Id.* at 1273.

At the due process hearing, the hearing officer ultimately concluded that NMMI had no obligation to provide S.E. with a FAPE under the IDEA or the Rehabilitation Act, because plaintiffs failed to demonstrate that S.E. was otherwise qualified to attend NMMI. *Id.* Both sides eventually appealed the ruling, leading to a decision by the appellate hearing officer that NMMI was not a public school for purposes of the IDEA, and that plaintiffs' IDEA claim " 'bordered on being wholly insubstantial and frivolous.' " *Id.* (citations omitted in original). Having exhausted the administrative hearing process, plaintiffs filed a civil action in federal court against NMMI asserting claims un-

---

**29.** Section 504 of the Rehabilitation Act of 1973 ("section 504") prohibits discrimination against otherwise qualified disabled persons under any program or activity receiving federal financial assistance. *See* 29 U.S.C. § 794 (2006).

> Section 504 differs markedly from the IDEA. As outlined by an interest group for those with learning disabilities:
>> The major differences between IDEA and [s]ection 504 are in the flexibility of the procedures. For a child to be identified as eligible for services under [s]ection 504, there are less specific procedural criteria that govern the requirements of the school personnel. Schools may offer a student less assistance and monitoring with [s]ection 504 because there are fewer regulations by the federal government to instruct them, especially in terms of compliance.
>> In contrast, a child identified for services under the IDEA must meet specific criteria. The degree of regulation is more specific in terms of time frames, parental participation, and formal paperwork requirements. IDEA also addresses the special education of students with disabilities from preschool to graduation only (from ages 3 to 21). Section 504 covers the lifespan and safeguards the rights of persons with disabilities in many areas of their lives, including employment, public access to buildings, transportation, and education.
>
> Council for Exceptional Children: Understanding the Differences Between IDEA and Section 504, http://www.ldonline.org/article/6086 (last visited Jun. 20, 2008).

der the IDEA, section 504 of the Rehabilitation Act, and Title II of the ADA. *Id.*

The district court rejected plaintiffs' IDEA claim. Specifically, the district court held that nothing in the IDEA "support[s] the theory that special education is merely a service that must be provided wherever the student chooses to attend school." *Id.* (citations omitted). The district court also granted summary judgment to NMMI on the ADA and Rehabilitation Act claims, holding that "if the state satisfied its obligations under the IDEA it was not required to do more under the ADA or the [Rehabilitation Act]." *Id.*

On appeal to the Tenth Circuit, a three-judge panel found that plaintiffs failed to exhaust their administrative remedies. *Id.* at 1279. The court made this finding based on what it considered two fundamental circumscriptions of the IDEA's state focus. First, the *Ellenberg* court chided the plaintiffs for not obtaining an IEP from either of S.E.'s local educational agencies for the 2003–2004 school year. *Id.* at 1276. By the *Ellenberg* court's reasoning, the plaintiffs disregarded this requirement in favor of unilaterally determining that NMMI was their child's least restrictive learning environment. *Id.* Second, plaintiffs made no request to alter the IEP fashioned by TMSD the previous year before again deciding unilaterally that NMMI would represent their child's least restrictive learning environment. *Id.* Because the plaintiffs had neither sought out a current IEP for the school year nor requested an alteration to the previous IEP, the Tenth Circuit opined that they "had no way of deciding whether a military-style education is appropriate for S.E.," and moreover, that "neither this court nor a district court has a factual record adequate to determine if NMMI is appropriate for S.E." *Id.* at 1276–77.

The Tenth Circuit arrived at this holding by noting that "[a]lthough the [plaintiffs] characterize the relief they seek as S.E.'s admission to NMMI, their only legally cognizable injury under the IDEA is the state's failure to provide their child with a FAPE in the least restrictive environment." *Id.* at 1276. Where the issue presents itself thus, with a plaintiff claiming that the state has not provided a child with a FAPE in the least restrictive environment, the Tenth Circuit held that "the need for an IEP is especially great." [30] *Id.* Correspondingly, to obtain the required IEP, the *Ellenberg* court reasoned that the "IDEA's requirements that students receive an education in the [least restrictive environment] do not preclude a state from initially assigning students to local school districts and requiring them to seek an IEP from that school district." *Id.* at 1278. Recognizing the primacy of the state in the IDEA construct, the court concluded that "[i]t is to the states, not students, that Congress delegated authority to implement the IDEA." *Id.* (citing *Rowley,* 458 U.S. at 207–08, 102 S.Ct. 3034).

### b. The *Ellenberg* decision does not persuade this Court that RR failed to exhaust his administrative remedies

The facts of the instant case militate against applying the broad holding of the *Ellenberg* court. Fundamentally, the *Ellenberg* court dealt with the ability of parents to exercise their right to district court review. *Id.* at 1273. In the case before this Court, only EPISD appeals the findings of the due process hearing provided

---

30. As noted by the Tenth Circuit, the Supreme Court has stated that Congress envisioned the IEP "as the centerpiece of the [IDEA's] education delivery system." *Ellenberg,* 478 F.3d at 1277 (quoting *Honig,* 484 U.S. at 311, 108 S.Ct. 592).

by the State of Texas. Thus, the Tenth Circuit's concern that students might supplant the state's authority under the IDEA does not translate. To the contrary, RR's local educational agency now seeks to overturn the state's findings through the federal courts.

Additionally, the *Ellenberg* court sought to correct what it saw as a student trying to bypass the IDEA. *See Ellenberg,* 478 F.3d at 1278. Indeed, the Tenth Circuit felt that the plaintiffs' refusal to seek a current IEP or modify their child's previous IEP prevented any federal court from making a determination as to what constituted the child's least restrictive learning environment. *Id.* at 1276–77. In the instant case, however, RR exercised his statutorily guaranteed right to a due process hearing, not to contravene the state's authority to draft his IEP, but rather, to petition the State of Texas to compel his local educational agency, EPISD, to grant him an IEP. *See* Def. Berry's Mot. to Dismiss 9.

For its part, EPISD avers that the process of developing RR's IEP was slated to begin at the STAT committee meeting cancelled by RR on September 24, 2006. Def. EPISD's Resp. 9. RR's history with EPISD's STAT committee, however, calls the potential value of that meeting into question. The words of the SEHO presiding over RR's due process hearing state as much:

> I find that [EPISD] violated the time lines for an initial evaluation because the matter was repeatedly referred to the STAT committee. It's clear that the STAT committee was set up to provide a student support and intervention before a special education referral is made. However, in practice, the [c]ommittee is

merely an obstacle to parents who want to access the special education referrals .... [the IDEA] gives the parent a right to seek an evaluation and overrides local district policy concerning intervening procedures.

AR Vol. I, 8.

Moreover, the evidence demonstrates that the STAT committee reviewed RR's case on numerous occasions from 2001 to 2005, and only once did the STAT committee bother to undertake the evaluation for special education to which the IDEA guaranteed RR access.[31] AR Vol. I, 5–7. Thus, while the plaintiffs in *Ellenberg* were attempting to circumnavigate the state's role in providing special education services under the IDEA, RR employed the State of Texas's due process hearing procedures to command EPISD to begin crafting his IEP. In so doing, RR called upon the authority delegated to the State of Texas by the IDEA, which the *Ellenberg* court extolled as the proper avenue for following the mandates of the IDEA. *See Ellenberg,* 478 F.3d at 1278 (citing *Rowley,* 458 U.S. at 207–08, 102 S.Ct. 3034). Stated plainly, the plaintiffs in *Ellenberg* sought to make their own rules for educating their child. In the case before this Court, RR petitioned the State of Texas to compel EPISD to follow the rules. Such action clearly comports with the spirit of the Tenth Circuit's decision in *Ellenberg.*

Additionally, the Court finds no compelling justification for importing the Tenth Circuit's holding in *Ellenberg* into the Western District of Texas. Under binding Fifth Circuit precedent, a plaintiff may file an IDEA claim in federal court once all administrative remedies have been exhausted or exhaustion has been proven

---

**31.** This single evaluation determined RR to *not* be eligible for special education services.

AR Vol. I, 5.

to be futile or inadequate. *See Gardner,* 958 F.2d at 112; 20 U.S.C. § 1415(i)(2)(A). The relevant administrative remedies in Texas derive from the text of the IDEA and the Texas Administrative Code. *See* 20 U.S.C. §§ 1415(f)(1)(A), (i)(2)(A); 19 Tex. Admin. Code § 89.1151(b). Notably, the text of the IDEA states that when parents have complaints about the FAPE provided by their local school district, they "*shall* have an opportunity for an impartial due process hearing," and that this hearing "*shall* be conducted .... as determined by State law." *See* 20 U.S.C. § 1415(f)(1)(A) (emphasis added). The affirmative rights granted by this statute make no mention of parents necessarily obtaining an IEP before pursuing their due process hearing rights. Moreover, to rule that parents *must* obtain an IEP before exercising their due process hearing rights ignores the possibility of a local educational agency abridging a child's right to an IEP through intervening bodies like EPISD's STAT committee.

Accordingly, this Court finds that RR properly exhausted his administrative remedies. Neither the IDEA nor Texas law require parental participation in EPISD's STAT committee whatsoever. Consequently, both the SEHO and this Court have jurisdiction to decide RR's case.

### 3. An exception to the IDEA statute of limitations allows RR to pursue some of his claims which occurred before September 26, 2005

■ As its third challenge to the SEHO's decision, EPISD argues that a limitations bar precludes RR's claims which occurred before September 26, 2005.[32] Def. EPISD's Resp. 10–14. EP-ISD bases this argument on the text of the IDEA, which provides as follows:

> A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows.

20 U.S.C. § 1415(f)(3)(C).

EPISD explains that the State of Texas has exercised its authority under the IDEA to implement its own time limitation for due process hearings. Def. EPISD's Resp. 11. Specifically, the Texas Administrative Code allows that "[a] parent or public education agency must request a due process hearing within one year of the date the complainant knew or should have known about the alleged action that serves as the basis for the hearing request." 19 Tex. Admin. Code § 89.1151(c). EPISD also argues that plaintiffs bear the burden to establish an exception to this one-year statute of limitations. Def. EPISD's Resp. 11 (citing 20 U.S.C. § 1415(f)(3)(D); 34 C.F.R. § 300.511(e) (reiterating the general two-year statute of limitations that states may choose to supercede)).

#### a. Exceptions to the IDEA statute of limitations

The IDEA does allow a narrow set of exceptions to its time limitations. First, the statute of limitations shall not apply if a parent was prevented from requesting a due process hearing due to "specific misrepresentations by the local education agency that it had resolved the problem forming the basis of the complaint." 20 U.S.C. § 1415(f)(3)(D)(i); *see* 34 C.F.R

32. EPISD did present the affirmative statute of limitations defense before the SEHO. AR Vol. I, 163. *See also* Fed.R.Civ.P. 8(c); *F.T.C.*

*v. Nat'l Bus. Consultants, Inc.,* 376 F.3d 317, 322 (5th Cir.2004) ("A statute of limitations defense is an affirmative defense").

§ 300.511(f)(1). In addition, the statute of limitations shall not apply where a parent failed to exercise their right to a due process hearing on account of "the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent." 20 U.S.C. § 1415(f)(3)(D)(ii); *see* 34 C.F.R § 300.511(f)(2).

This second exception addresses the IDEA requirement that school districts provide parents with "a copy of procedural safeguards" at least once a year, or upon the occurrence of one of the following events:

(i) upon initial referral or parental request for evaluation;

(ii) upon the first occurrence of the filing of a complaint under subsection (b)(6) of this section; and

(iii) upon request by a parent.

20 U.S.C. § 1415(d)(1)(A).

Following any one of these catalysts, local educational agencies incur the affirmative duty to transmit to parents a complete explanation of the IDEA procedural safeguards, written in the parents' native language, and written "in an easily understood manner." *Id.* § 1415(d)(2). This notice, which "shall include a full explanation of the [IDEA] procedural safeguards," must contain all statutory and administrative provisions relating to:

(A) independent educational evaluation;

(B) prior written notice; [33]

(C) parental consent;

(D) access to educational records;

(E) the opportunity to present and resolve complaints, including—

(i) the time period in which to make a complaint;

(ii) the opportunity for the agency to resolve the complaint; and

(iii) the availability of mediation;

(F) the child's placement during pendency of due process proceedings;

(G) procedures for students who are subject to placement in an interim alternative educational setting;

(H) requirements for unilateral placement by parents of children in private schools at public expense;

(I) due process hearings, including requirements for disclosure of evaluation results and recommendations;

(J) State-level appeals (if applicable in that State);

(K) civil actions, including the time period in which to file such actions; and

(L) attorneys' fees.

*Id.*

Notably, this duty to give notice of procedural safeguards makes no accounting for those parents who have received repeated notices from an educational agency. Rather, the statute dictates that local edu-

---

**33.** As outlined by the IDEA, "prior written notice" includes the following:

(A) a description of the action proposed or refused by the agency;

(B) an explanation of why the agency proposes or refuses to take the action and a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action;

(C) a statement that the parents of a child with a disability have protection under the procedural safeguards of this subchapter and, if this notice is not an initial referral for evaluation, the means by which a copy of a description of the procedural safeguards can be obtained;

(D) sources for parents to contact to obtain assistance in understanding the provisions of this subchapter;

(E) a description of other options considered by the IEP Team and the reason why those options were rejected; and

(F) a description of the factors that are relevant to the agency's proposal or refusal.

20 U.S.C. § 1415(c)(1).

cational agencies "shall" give this notice to parents on any occasion, as happened in the present case, where a parent makes a request for an evaluation. *See id.* § 1415(d)(1)(a).

Absent the application of one of these exceptions, all claims in the instant case occurring before September 26, 2005, would be barred by the relevant one-year statute of limitations. *See* 19 TEX. ADMIN. CODE § 89.1151(c).[34] For its part, EPISD ardently argues for a bar on all claims and occurrences prior to that date. Def. EP-ISD's Resp. 10–14. The Court now turns to ascertaining whether the SEHO erred in considering any actions occurring before September 26, 2005.

As an initial matter, the Court notes that the SEHO's decision neglects to mention the relevant Texas statute of limitations. Strikingly, the only reference to anything resembling a time limitation arises from the SEHO's notation that "[b]oth [RR] and [EPISD] questioned witnesses and presented evidence which was beyond the 2005–2006 school year pled by [RR]." AR Vol. I, 7. Based upon the SEHO's observation that RR pleaded actions for the "2005–2006" school year, the order appears to confuse the precise meaning of "one year" as contained in the Texas Administrative Code with the more amorphous term "school year." *See* 19 TEX. ADMIN. CODE § 89.1151(c). As a result, the SEHO offers no legal explanation as to why actions occurring in August 2005 should be considered along with those that occurred in September or October 2005. *See generally* AR Vol. I, 6–11. Regardless of the prominence that the term "school year" enjoys within the realm of childhood education, legal review demands a more precise application. If the SEHO found that one of the IDEA's exceptions allowed for consideration of evidence or actions occurring prior to September 26, 2005,

then the SEHO's decision should have enumerated which exception, if any, applied. Because the SEHO failed to do so, it is left to the Court to ascertain if either of the IDEA's exceptions to the Texas statute of limitations allowed for consideration of matters occurring in this case prior to September 26, 2005.

### i. EPISD made no specific misrepresentations to RR

Nothing in the record demonstrates that the IDEA's first exception to the Texas statute of limitations should apply. For the first of the exceptions to apply, the Court must find that EPISD made a "specific misrepresentation" to RR's parents that it had resolved the problem forming the basis of the complaint. *See* 20 U.S.C. § 1415(f)(3)(D)(i). As outlined by the SEHO, RR's four claims can be summarized as follows: (1) EPISD failed to timely evaluate RR for special education services in October 2005; (2) EPISD failed to provide RR with IDEA procedural safeguards; (3) EPISD failed to provide RR written notice of refusal to provide a special education referral; and (4) EPISD violated the Child Find provisions of the IDEA. AR Vol. I, 4. There is no evidence in the record that EPISD made any misrepresentation to RR.

### ii. EPISD did prevent RR from seeking a due process hearing by failing to provide procedural safeguards

The IDEA provides for another scenario by which RR could plead actions outside the one-year statute of limitations. In relevant part, this section of the IDEA reads as follows:

> The timeline described in subparagraph (C) shall not apply to a parent if the parent was prevented from requesting the hearing due to the local educational

---

**34.** RR filed his due process complaint on September 26, 2006. AR Vol. I, 4.

agency's withholding of information from the parent that was required under this subchapter [35] to be provided to the parent.

20 U.S.C. § 1415(f)(3)(D)(ii).

The subparagraph referred to by 20 U.S.C. § 1415(f)(3)(D)(ii) states that:

A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows.

*Id.* § 1415(f)(3)(C).

Therefore, this exception, when met, operates to lift both federal and state statutes of limitations. *See id.* Recognizing this, to determine if the one-year Texas statute of limitations should be lifted, the Court must ascertain if EPISD's withholding of procedural safeguards in August 2005 prevented RR's parents from requesting a due process hearing.

As an initial matter, the Court recognizes the SEHO's two findings that EPISD failed to provide procedural safeguards to RR in August 2005 and failed to provide prior written notice in October 2005. AR Vol. I, 10. The record supports these findings.

The record also supplies no documentation of RR's parents having direct, actual knowledge of their right to a due process hearing until September 18, 2006. AR Vol. I, 772, 775 (showing that RR's father made his intention to request a due process hearing known between September 18 and 20, 2006). By that date, RR's parents had retained counsel. AR Vol. I, 7. More-

over, and as this Order will explain in a subsequent section, EPISD has made no proffer of evidence to convince this Court to impute constructive knowledge to RR's parents between August 2005 and September 2006.[36]

■■■ When a local educational agency delivers a copy of IDEA procedural safeguards to parents, the statutes of limitations for IDEA violations commence without disturbance. Regardless of whether parents later examine the text of these safeguards to acquire actual knowledge, that simple act suffices to impute upon them constructive knowledge of their various rights under the IDEA. Conversely, in the absence of some other source of IDEA information, a local educational agency's withholding of procedural safeguards would act to prevent parents from requesting a due process hearing to administratively contest IDEA violations until such time as an intervening source apprised them of their rights.

When EPISD withheld information from RR's parents in August and October of 2005, EPISD denied them the knowledge necessary to request a due process hearing. As a consequence, the IDEA directs that this Court "shall not apply" the Texas one-year statute of limitations to RR's claims. *See* 20 U.S.C. § 1415(f)(3)(D)(ii).

iii. **The SEHO properly found that EPISD failed to provide IDEA procedural safeguards following the August 2005 request for evaluation and to provide notice of its refusal to evaluate RR in October 2005**

■■■ EPISD's fourth challenge attacks the SEHO's finding that EPISD failed to

---

**35.** The subchapter referred to here begins at 20 U.S.C. § 1411 and ends at 20 U.S.C. § 1419. Thus, the information referred to in this section includes the procedural safe-

guards and prior written notice required by 20 U.S.C. § 1415(d).

**36.** *See infra,* section II(B)(3)(a)(iii)(c).

provide procedural safeguards to RR's parents in August 2005 and to provide notice of its refusal to evaluate RR in October 2005. *See* Pl. EPISD's First Original Compl. 6. As to both determinations, EPISD argues that the SEHO's findings are "legally erroneous." *Id.* Furthermore, EPISD introduces three theories to rebut the SEHO's conclusion. The Court addresses these each in turn.

### a. The SEHO correctly found that RR's parents requested a special education evaluation in August of 2005

First, EPISD argues that RR's parents made no request for evaluation in August of 2005. According to EPISD, "[t]he evidence establishes that [RR's parents] did not in fact request a referral, but instead raised the possibility of a referral" with Mrs. Gandara ("Gandara"), the Assistant Principal at RR's school. Def. EPISD's Resp. 13. To support this notion, EPISD cites Gandara's own notes, dated August 22, 2005, which memorialize the meeting between Gandara and RR's mother as follows, *verbatim ac litteratim:* "Parent has requested possible Sp. Ed. testing. Please Keep copies of student work, etc. you may think is important to show (90 days)." AR Vol. I, 265.[37] Oddly, EPISD admits that it "did not ignore this 'request'; it promptly scheduled a [STAT committee] meeting to discuss referral of [RR]." Def. EPISD's Resp. 13. Furthermore, EPISD goes so far as to declare that "[Gandara] promptly acted upon this concern," and "a meeting was scheduled for October 20, 2005." *Id.*

The conflated logic of this argument exposes the shortcomings of EPISD's special education referral process. The text of the IDEA details that "a parent of a child .... may initiate a request for an initial evaluation to determine if the child is a child with a disability." *See* 20 U.S.C. § 1414(a)(1)(B). More importantly, the IDEA demands that either the state or a local educational agency "*shall* conduct a full and individual initial evaluation .... before the initial provision of special education and related services to a child with a disability under this part." *See* 20 U.S.C. § 1414(a)(1)(A) (emphasis added). Despite these affirmative duties imposed by federal statute, the SEHO explained that the STAT committee has devolved from a body meant to "provide support and intervention" to "an obstacle to parents who want to access the special education referrals." AR Vol. I, 8. Recognizing this discrepancy between federal law and EPISD's practice, the SEHO opined:

> The STAT process, while a mandatory district requirement, is not a prerequisite to conducting a special education evaluation. Upon a parental request for a special education evaluation, the campus should begin the special education evaluation process while at the same time provid[ing] intervention strategies through the STAT [c]ommittee.

AR Vol. I, 6.

Regardless of the corollary measures EPISD selects to facilitate the implementation of its IDEA obligations, the Court adopts the SEHO's finding that the IDEA "gives the parent a right to seek an evaluation and overrides local district policy concerning intervening procedures." AR Vol. I, 8. In those instances where the STAT committee impedes the exercise of rights guaranteed by federal law, those practices violate the IDEA.

---

**37.** This ninety (90) day period was not chosen without cause. As noted by the SEHO, Texas law provides that school districts have "60 days from receiving parental consent to complete an evaluation, and 30 additional days to convene an ARD." AR Vol. I, 8.

In August of 2005, the STAT committee process preceded RR's ability to receive an FIE.[38] Following Gandara's meeting with RR's mother, the evidence demonstrates that Gandara went about initiating the STAT process. Although EPISD argues that the two only discussed the possibility of special education testing, fundamentally, the STAT committee itself acted to reduce a parent's federally guaranteed right to an FIE to nothing more than a possibility. As a consequence, and based upon Gandara's actions, the Court cannot agree with EPISD's argument that RR's parents made no request for evaluation in August of 2005.

### b. The SEHO properly found that EPISD failed to provide written notice of its refusal to evaluate RR in October 2005

Similarly, EPISD contests the SEHO's finding that EPISD failed to provide notice of its refusal to evaluate RR in October 2005. EPISD avers that at the STAT committee meeting held on October 20, 2005, "which included [RR's] mother, all agreed that special education referral testing of [RR] was not warranted." Def. EPISD's Resp. 14 (citing AR Vol. I, 676; AR Vol. II, 125:4–126:16). According to the evidence, the October 2005 STAT committee chose to forgo special education testing in favor of a recommendation that included modifying RR's section 504 accommodations, additional tutoring, and attendance at Saturday tutoring camps. AR Vol. I, 676. Additionally, the minutes of the STAT committee meeting, attended by RR's mother and five EPISD officials, record the committee's agreement that "special education testing is not warranted at this time." *Id.* With no rebuttal evidence

from RR, the record convincingly establishes that RR's mother did agree at the October 2005 STAT committee meeting to forgo special education testing for RR.

Consequently, the question before the Court is whether parental consent to forgo evaluation, given following a school district's failure to provide IDEA safeguards, relieves the district of its obligation to provide the parent with notice of its refusal to evaluate the child. Based upon the plain text of the IDEA, the Court finds that it does not.

Under the IDEA, local education agencies are required to provide "prior written notice" to the parents of a child, whenever that agency proposes to initiate or change, or refuses to initiate or change "the identification, evaluation, or educational placement of the child, or the provision of a FAPE to the child." 20 U.S.C. § 1415(b)(3). Federal regulations reflect these mandates without significant alteration. *See* 34 C.F.R. § 300.503. Nowhere in either the text of the IDEA or the federal regulations have exceptions been carved out to relieve local educational agencies of this responsibility when a parent agrees with the agency's refusal to evaluate. Furthermore, EPISD cannot overcome the suspicion that tarnishes RR's consent, as it was given without knowledge of then current IDEA safeguards. The SEHO held as much, finding that EPISD chose not to send written notice to RR "based on the mistaken belief that RR no longer wanted a special education referral." AR Vol. I, 7. Without reaching the unnecessary conclusion as to whether this consent should be considered valid, the Court finds no support in the extant case law or federal regulations to support EPISD's position. Federal law in this regard is clear; wheth-

---

**38.** Or, as the SEHO found, "[f]unctionally, in this case, the STAT process became a precondition for evaluation." AR Vol. I, 9.

er parents agree to the refusal or not, local educational agencies must comply with their IDEA responsibility to provide written notice upon their refusal to evaluate a child for special education services.

### c. RR was not on constructive notice of his IDEA rights

As a global argument to challenge its refusal to provide procedural safeguards in August 2005 or notice of its refusal to evaluate in October 2005, EPISD argues that regardless of its IDEA requirements, RR's parents had been placed on constructive notice of their IDEA rights. *See* Def. EPISD's Resp. 11–14. Or, as EPISD declares, "[t]he evidence clearly showed that [RR's] parents were aware of their procedural rights under the IDEA." *Id.* at 11. EPISD supports this contention by noting that RR previously received special education services from EPISD from 1997 to 1998, and that RR last received an FIE in early 2001. *Id.* (citing AR Vol. I, 172, 238–48, 534–78). Facially, the record supports this position, as EPISD's archives illustrate that RR received copies of procedural safeguards on six separate occasions between November 19, 1996, and May 7, 2001. AR Vol. I, 172–73.

Actual knowledge is defined as "direct and clear knowledge." BLACK'S LAW DICTIONARY 888 (8th ed.2004). Unlike actual knowledge, constructive knowledge charges an individual "with knowledge of that which in the exercise of reasonable care he should have known." *Shenker v. Baltimore & O.R. Co.,* 374 U.S. 1, 13, 83 S.Ct. 1667, 10 L.Ed.2d 709 (1963). Regardless of the context, when a party asserts the defense of constructive knowledge, the Court's inquiry must focus on whether the party alleged to possess constructive knowledge *should have known* the information in dispute.

Despite EPISD's efforts, the Court finds insufficient support for imputing constructive knowledge to RR. Irrespective of the frequency with which EPISD provided safeguards to RR between 1996 and 2001, EPISD can point to nothing in the federal statutes or case law that would discharge its responsibility to comply with IDEA notice requirements in 2005. To the contrary, the IDEA states, without equivocation, that local education agencies *shall* provide procedural safeguards following a request for special education and *must* provide written notice of a refusal to perform a special education evaluation. *See* 20 U.S.C. § 1415(b)(3), (d)(1)(A). Had Congress not intended to reduce the complexities of the IDEA into a form that parents could easily access and take advantage of, there would be no reason for the IDEA to require the states to offer parents an exhaustive explanation of procedural safeguards, written in the native language of the parents, and "written in an easily understandable manner."[39] *See id.* § 1415(d)(2).

Implicit within these detailed requirements is a recognition that reasonable individuals might not comprehend either their administrative or judicial rights in the event that a local educational agency violated its obligation to provide notice of IDEA procedural safeguards. More importantly, these notice requirements convey legislative acknowledgment that even with proper transmission of safeguards, parents still might not possess direct, actual knowledge of their rights to a due process hearing. Correspondingly, the

---

**39.** One federal court has recently struck down a local educational agency's copy of procedural safeguards for not being written in an easily understood manner as required by 20 U.S.C. § 1415(d)(2). *See "Makiko D." v. State of Hawaii,* No. 06–00189 JMS/BMK, 2007 WL 1153811, at *6 (D.Haw. Apr. 17, 2007).

IDEA's safeguard requirements serve another purpose beyond protecting parents by ensuring that they receive notice of their rights upon each request for evaluation. Indeed, the requirement also protects local educational agencies, as the act of transmitting those safeguards, which must be done upon each request, suffices to place parents on constructive notice of their rights to a due process hearing. The congressional intent behind such categorical imperatives is clear. More importantly, the legislative motivation underpinning these mandates demonstrates congressional recognition of the many amendments which the IDEA has undergone.[40]

Of particular relevance to RR's case, the most extensive revisions of the IDEA occurred in 2004, leading many to refer to the current IDEA as "IDEA 2004." *See* Individuals with Disabilities Education Improvement Act of 2004, Pub.L. No. 108–446, 118 Stat. 2646 (2004). Requirements regarding statutes of limitations, the ability of school districts to request a due process hearing, and scores of additional provisions became law with the implementation of this Act in 2005. *See id.* In the exercise of reasonable care, RR might never receive notice of these amendments without an updated copy of procedural safeguards or retaining counsel. Yet, despite these sweeping transformations in the IDEA, EPISD would have this Court find that its prior provision of safeguards from 1996 to 2001 fulfilled its IDEA obligations in 2005. Put another way, EPISD would have this Court find that despite the landmark changes in the IDEA that oc-

curred in 2004, RR should have known of the changes based on upon safeguards given from 1996 to 2001. This argument lacks both logic and merit, and as such, the Court cannot find that RR possessed constructive knowledge of his IDEA rights in Fall 2005.

Based upon the preponderance of the evidence, and giving due weight to the SEHO's findings, the Court finds that EPISD failed to provide RR with procedural safeguards in August 2005 and with notice of its refusal to evaluate RR in October 2005.

### 4. The SEHO properly found that EPISD violated its Child Find requirements in October 2005

 Finally, EPISD seeks to overturn the SEHO's finding that EPISD violated its Child Find obligation from August to October 2005. Pl. EPISD's First Original Compl. 6. Although EPISD also challenges the SEHO's finding that EPISD should have referred RR for special education testing, the SEHO's finding that EPISD failed its Child Find obligations by not referring RR for special education testing acts to merge these two arguments. *See id.* Therefore, the Court must determine the amalgamated issue of whether the SEHO erred in finding that EPISD failed its Child Find obligations from August to October 2005 by not referring RR for special education testing.

Congress enacted the IDEA's Child Find provisions to guarantee access to special education.[41] To that end, the IDEA's

---

40. For a synopsis of the extensive revisions to the IDEA, see http://www.wrightslaw.com/idea/idea.2004.all.pdf (last visited Jun. 8, 2008).

41. The comments to the regulations reflect this goal: "Child [F]ind .... is an ongoing activity that [school districts] should be engaged in throughout the year for all children

in order to meet the statutory obligations to ensure that all children in the State are located, identified and evaluated and that all children have the right to a FAPE." 64 Fed.Reg. 48,12603 (1999). This reflects the IDEA's overall purpose "to ensure that all children with disabilities have available to them [a FAPE]." 20 U.S.C. § 1400(d)(1)(A).

Child Find obligation imposes on each local educational agency an affirmative duty to have policies and procedures in place to locate and timely evaluate children with suspected disabilities in its jurisdiction, including "[c]hildren who are suspected of being a child with a disability .... and in need of special education, even though they are advancing from grade to grade[.]" 34 C.F.R. §§ 300.111(a), (c)(1); *see* 20 U.S.C. § 1412(a)(3) (imposing on each state and local educational agency the affirmative duty to identify, locate, and evaluate all children with disabilities within its jurisdiction). The Child Find duty is triggered when the local educational agency has reason to suspect a disability coupled with reason to suspect that special education services may be needed to address that disability. *Dep't of Educ., State of Hawaii v. Cari Rae S.*, 158 F.Supp.2d 1190, 1194 (D.Haw.2001); *see C.G. v. Five Town Cmty. Sch. Dist.*, No. 05–237–P–S, 2007 WL 494994, at *25 (D.Me. Feb.12, 2007); *Kanongata'a v. Washington Interscholastic Activities Ass'n*, No. C05–1956C, 2006 WL 1727891, at *20 (W.D.Wash. Jun.20, 2006). When these suspicions arise, the local educational agency "must evaluate the student within a reasonable time after school officials have notice of behavior likely to indicate a disability." *Strock v. Indep. Sch. Dist. No. 281*, No. 06–CV–3314, 2008 WL 782346, at *7 (D.Minn. Mar. 21, 2008) (citations omitted).

Upon judicial review, then, the Court must undertake a two-part inquiry to determine whether a local educational agency has complied with its Child Find responsibilities. First, the Court must examine whether the local educational agency had reason to suspect that a student had a disability, and whether that agency had reason to suspect that special education services might be needed to address that disability. Next, the Court must determine if the local educational agency evaluated the student within a reasonable time after having notice of the behavior likely to indicate a disability.

### a. The SEHO correctly found that EPISD should have suspected RR had a disability, and that special education services might be needed to address that disability

In the present case, RR asserted before the SEHO that "based on the facts and circumstances known to [EPISD] before [RR] filed for a due process hearing, [EPISD] should have referred RR for a special education evaluation on its own initiative." AR Vol. I, 9. EPISD responded by arguing that its provision of other services, including section 504 accommodations, tutoring, and Texas Assessment of Knowledge and Skills ("TAKS") assistance acted to fulfill its Child Find obligations. *Id.* Presented with the same evidence presently before this Court, the SEHO held that EPISD did not adhere to the Child Find requirements of the IDEA. AR Vol. I, 11.

According due weight to the SEHO's findings, and in the absence of any references whatsoever to authority or the record by EPISD,[42] the Court finds insufficient justification to overturn the finding that EPISD failed to meet its Child Find requirements. Under Fifth Circuit precedent, one of the factors used to measure whether a local educational agency has met its IDEA responsibility to provide a FAPE is whether the accommodations accorded to the student demonstrate positive academic benefits. *See Bobby R.*, 200 F.3d

---

**42.** *See Smith*, 391 F.3d at 625 (citations omitted) (holding that when a nonmovant fails to refer to evidence in the summary judgment record in the response to the motion for summary judgment, that evidence is not properly before the district court).

at 347 (citing *Michael F.,* 118 F.3d at 253). Yet, as announced in the SEHO's decision, by Spring of 2005, RR had failed the TAKS test "for *three years in a row.*" AR Vol. I, 6 (emphasis in original). Moreover, RR displayed "continuing difficulties in reading, math, and science" which the SEHO found to be "clear signals that an evaluation was necessary and appropriate." *Id.* When confronted by this reality at the October 2005 STAT meeting, EPISD chose not to evaluate RR for special education services. AR Vol. I, 676.

Instead of evaluating RR, the October 2005 STAT committee recommended modifications to RR's section 504 accommodations, additional tutoring, and attendance at Saturday tutoring camps. AR Vol. I, 676. Why EPISD's STAT committee would have suggested these measures, knowing that RR had undertaken each of these steps in the past three years and that none had helped him achieve passing TAKS scores, simply baffles this Court. *See* AR Vol. I, 9. Faced with three years of repeated failure, the Court agrees with the SEHO's finding that "[a] special education evaluation would have clearly indicated whether RR had a disability that was affecting his educational progress." *Id.* Further, the Court concurs in the finding that EPISD's "reliance on a purported agreement to continue RR in section 504 and not send the parent's referral to the special education department reflected a mistake on [EPISD's] part." *Id.*

The IDEA's mandate is clear. States and local educational agencies must identify, locate, and evaluate students who they suspect may be disabled[43] and develop methods to provide them with special education services. *See* 20 U.S.C. § 1412(a)(3)(A). Based on RR's record of

consecutive failure on the TAKS test, his continuing difficulties in multiple subjects, and the inability of prior accommodations to improve his scores, the SEHO believed that EPISD had reason to suspect that RR had a disability and that special education services might be needed to address that disability. Acting on these reasonable concerns, and in keeping with its Child Find obligations, the SEHO held that EPISD should have referred RR for evaluation in October 2005. Neither the record nor EPISD's pleadings justify overturning this finding, and as such, the Court affirms this section of the SEHO's ruling.

**b. The SEHO properly found that EPISD did not evaluate RR within a reasonable time after suspecting he might have a disability**

The second component of the Court's Child Find inquiry requires the Court to determine if the local educational agency evaluated the student within a reasonable time after suspecting the student might have a disability. The Fifth Circuit has yet to rule on this point, and other federal courts faced with this issue have developed varying standards. *Compare New Paltz Cent. Sch. Dist. v. St. Pierre ex rel. M.S.,* 307 F.Supp.2d 394, 401 (N.D.N.Y.2004) (holding that a delay of approximately ten months from the time mother informed school district that son was experiencing difficulties until performance of comprehensive evaluation constituted a Child Find violation), *and Cari Rae,* 158 F.Supp.2d at 1195–97 (finding that a delay of at least six months from point at which school had reason to suspect child had disability to scheduling of evaluation constituted a Child Find violation), *with W.B. v. Matula,* 67 F.3d 484, 501 (3d Cir.1995),

---

**43.** The Child Find obligation extends to all children suspected of having a disability, not merely to those students who are ultimately determined to be disabled. 34 C.F.R. § 300.111(c)(1).

*abrogated on other grounds by A.W. v. Jersey City Pub. Schs.,* 486 F.3d 791 (3d Cir.2007) (holding that a delay of six months from observation of behavior until referral for evaluation constituted a triable issue as to Child Find violation), *and O.F. ex rel. N.S. v. Chester Upland Sch. Dist.,* 246 F.Supp.2d 409, 417–18 (E.D.Pa.2002) (finding that a triable issue existed as to whether a delay of almost twelve months from observation that child was having emotional difficulties in school until completion of comprehensive evaluation constituted a Child Find violation). In following the majority of federal courts that have considered the issue, this Court finds that the thirteen months that passed between RR's request for evaluation and EPISD's offer of evaluation was unreasonable. As a result, the Court affirms the SEHO's finding that EPISD failed its Child Find obligation from August to October 2005 by not referring RR for special education testing.

## III. CONCLUSION

Having granted "due weight" to the SEHO's decision, the Court finds that EPISD has failed to demonstrate, by a preponderance of the evidence, that any or all of the SEHO's findings should be overturned. To the contrary, after undertaking a "virtually de novo" review of the record, the Court finds that EPISD has failed to meet its burden of persuasion. As a consequence, the Court hereby **AFFIRMS** the SEHO's findings *in toto.*

With no remaining challenges to the merits of the SEHO's decision, the Court hereby **GRANTS** RR's Motion for Summary Judgment. Furthermore, because RR successfully prosecuted his case before the SEHO, RR secured a judgment bear-ing "judicial imprimatur,"[44] thereby altering the legal relationship between RR and EPISD in such a manner as to confer prevailing party status upon RR. Correspondingly, RR may petition this Court for attorney fees under 20 U.S.C. § 1415(i)(3)(B).

In addition, the Court hereby **ORDERS** the following:

1. Because this Order accomplishes the remedy sought by RR's request for injunctive relief, RR's request for an affirmative injunction is **DENIED** as **MOOT.**

2. Because the evidence objected to by EPISD in its Response to RR's Motion for Summary Judgment[45] was not relied on by this Court, and because this material forms no part of this Order, these objections are **DENIED** as **MOOT.** *See Jinks v. Advanced Prot. Sys., Inc.,* 162 F.Supp.2d 542, 545 (N.D.Tex.2001).

3. Any remaining requests for attorney fees, and possible objections thereto, are hereby **ORDERED** to be entered pursuant to applicable Local Rules of the Western District of Texas. *See* W.D. Tex. Loc. R. CV–7(i).

**SO ORDERED.**

---

**44.** *See Buckhannon,* 532 U.S. at 605, 121 S.Ct. 1835.

**45.** Def. EPISD's Resp. 3 n. 4.