**AUSTIN INDEPENDENT SCHOOL DISTRICT**

v.

**ROBERT M.**

**Civ. No. 00CA523JN.**

United States District Court, W.D. Texas, Austin Division.

July 23, 2001.

Cynthia S. Buechler, Buechler & Associates, P.C., William M. Buechler, Buechler & Associates, P.C., Austin, TX, for Austin Independent School District, plaintiffs.

Karen Key Johnson, Attorney at Law, Austin, TX, for Robert M., b/n/f Lora M., Texas Education Agency, defendants.

## ORDER

NOWLIN, Chief Judge.

Before the Court are Plaintiff's Motion for Summary Judgment (Clerk's Doc. No.

15) filed 16 April 2001, Defendant's Response to Plaintiff's Motion for Summary Judgment (Clerk's Doc. No. 24) filed 8 May 2001, and Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment (Clerk's Doc. No. 26) filed 25 May 2001. Having considered the entire case file, the administrative record, and the applicable law, the Court enters the following Order GRANTING Plaintiff's Motion for Summary Judgment.

### Background [1]

Defendant Robert M. was a student at the Liberal Arts Academy ("LAA"), which is run by Plaintiff Austin Independent School District ("AISD"). The LAA is a magnet program for gifted students on the campus of Johnston High School. Robert and his mother wanted Robert to attend the LAA in order to be competitive for scholarships to Ivy League schools. As Robert's mother was worried that his grades in junior high school would keep him from being accepted into the LAA, she persuaded Robert's junior high school principal to write a letter on Robert's behalf to the LAA. The letter informed the LAA that Robert had been diagnosed with Attention Deficit Disorder ("ADD") in January 1996 and that this had adversely affected his grades. Robert was admitted to

the LAA on the condition that he maintain a "B" average.

Robert began attending the LAA in the fall of 1996. During his first two years at the LAA, Robert neglected to take his ADD medication regularly, skipped numerous classes, and regularly failed to do homework assignments. Not surprisingly, Robert's grades fluctuated and he failed French during his sophomore year. During this period of time, the administrators at the LAA told Robert that if his effort and attendance did not improve, he would be reassigned from the LAA to his home school. After Robert's sophomore year, the LAA followed through on this threat and reassigned Robert. However, Robert and his mother still wanted Robert to attend the LAA.[2] They convinced the director of the LAA to allow Robert to attend the LAA in renewable six-week contracts provided Robert maintained a "B" average, received no more than three tardies, and followed the LAA behavior guidelines. During the fall semester of his junior year, Robert persisted in skipping classes and failing to do homework. Nevertheless, on 8 December 1998, the LAA proposed several accommodations for Robert.[3] These accommodations were

---

1. Most of this section is taken directly from the Decision of the Hearing Officer dated 12 June 2000. The Court simply cannot fathom how the hearing officer's findings of fact support her conclusions of law.

2. While it is not particularly relevant, it is very hard to apportion the blame for what has transpired here between Robert and Robert's mother. Certainly, they both bear some of the responsibility. However, the only people that will ever probably know where the blame should fall are Robert and his mother. Along these lines, the Court would like to note that it knows that Robert's mother acted on Robert's behalf with the best intentions. Most every parent wants what is best for their child; some just get a little lost along the way.

3. The reaction of Robert and his mother to one such accommodation epitomizes the problem with this entire case. Robert was offered the opportunity to make up work in two of his classes over the winter break in order to allow him to pass with at least a 70. According to the hearing officer's findings, "Robert was upset at this option because his poor performance would be recorded and he was not given the option to retake any courses to attempt to achieve better grades" and Robert believed that "junior year grades are very important for college acceptance and [he did] not want[ ] his bad grades to be recorded." Assuming Robert was capable of a better performance, why did he not perform in such a manner during the regular semester and why did he think he would do so if given

never put in place, as Robert's mother withdrew him from the LAA on 11 January 1999.

Pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1487, a due process hearing was held before a special education hearing officer in October 1999. The hearing officer found that Robert "is eligible for special education services as a child who is Other Health Impaired and Emotionally Disabled," that AISD failed to provide Robert with a free appropriate public education, and that Robert's mother was "entitled to reimbursement in an amount in excess of $3,032.47, for over a year of high school courses, which is a reasonable amount."

## Summary Judgment Standard

■ The summary judgment standard under the IDEA is a bit different than the standard that applies to most other civil actions. Under the IDEA, any party "aggrieved" by the findings and decision made by an administrative hearing officer may bring suit in district court. 20 U.S.C. § 1415(i)(2)(A). The district court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of any party, and shall base its decision on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(B). As no party to this proceeding has requested the Court to hear additional evidence, a motion for summary judgment is simply a procedural device for asking the Court to decide the case on the basis of the administrative record. *Heather S. v. State of Wisconsin,* 125 F.3d 1045, 1052 (7th Cir. 1997); *see also Hunger v. Leininger,* 15 F.3d 664, 669 (7th Cir.1994). While the hearing officer's findings are to be given

"due weight," they are not conclusive and this Court's review of them is "virtually *de novo.*" *Teague Independent School District v. Todd L.,* 999 F.2d 127, 131 (5th Cir.1993).

## The Requirements of the IDEA

This case has tried the Court's patience. Many things should be written about this case; however, the Court will attempt to limit its comments to those necessary to put this case out of its misery forever. Simply stated, ambitious parents cannot will an uncooperative student into Yale. Moreover, school districts cannot, or at least should not, be commandeered by such parents in an attempt to bring their, not the child's, dream to fruition. In a nutshell, this is what has happened here. Robert's mother wanted Robert to get a scholarship to an Ivy League school. To this end, Robert's mother ensured that Robert secured a place in a magnet program for gifted students. Much to his mother's chagrin, Robert chose to squander this opportunity by skipping class, failing to do homework, smoking dope, neglecting to take his ADD medication, etc. While these choices are within Robert's purview, this is not the stuff of prestigious college scholarships. Never fear, Robert's mother is here. The choice for Robert's mother: Light a fire under the child or under the school district? As is all too often the case these days, the blame for Robert's failure to excel is placed in the most handy spot, as long as that spot is not Robert. In order to saddle AISD with the blame, the school district must somehow be shown to be deficient in its attempt to educate Robert. The deficiency? Lack of accommodations for Robert. The pro-

---

another opportunity? The fact that LAA even offered this to Robert seems to be a gracious gesture far in excess of anything that the LAA would ever be required to offer any student.

No one is ever entitled to success. Success should always be earned. To give out success to the undeserving is to degrade the success of people who have actually toiled for it.

posed remedy? Special education for Robert. The calculating brilliance of this plan is a thing to behold: Step 1—Get child into magnet program; Step 2—Blame school district when child does not receive high marks in magnet program; Step 3—Require school district to spoonfeed child until high marks are achieved; Step 4—Free ride at hoity-toity east-coast school. And this scheme almost worked. Had it been hatched a little sooner and managed a little better, it probably would have.

■ Turning to the legal reasons for the Court's decision, Robert does not meet the definition of "child with a disability." Under the IDEA,

> The term "child with a disability" means a child
>
> (i) with mental retardation, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (hereinafter referred to as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and
>
> (ii) who, by reason thereof, needs special education and related services.

20 U.S.C. § 1401(3)(A). The hearing officer determined that Robert "is eligible for special education services as a student who is Other Health Impaired and Emotionally Disturbed." Assuming, *arguendo*, that Robert is Other Health Impaired and Emotionally Disturbed, the Court finds that Robert did not and does not need special education.[4] What Robert needed was to commit to doing homework and regularly attending classes at LAA. As his early LAA performance and his teachers' affidavits make clear, Robert could have gotten through LAA with little difficulty. If the pressures of the LAA were too much for Robert, Robert's mother should have pulled him out of the LAA and sent him to his home school. The LAA appears to have threatened/suggested several times that Robert do just that: each time this met with disapproval from Robert's mother. This course of action was ill-conceived and was definitely more than a magnet program should be required to deal with. It would be a rare case indeed where a student who affirmatively chose to attend a magnet school for gifted students would be eligible for special education.[5] The answer in most situations like this is to put the child in his home school before

4. The Court has grave doubts about the hearing officer's findings of "Other Health Impaired and Emotionally Disturbed." First, emotionally disturbed is not enough; the child must suffer from *"serious* emotional disturbance." 20 U.S.C. § 1401(3)(A)(i) (emphasis added). If emotional disturbance were enough, it would be the rare teenager that would not meet the definition of § 1401(3)(A)(i). Second, the Court seriously doubts that Robert's ADD meets the definition of "other health impairments" as this phrase is used in the IDEA. Were this phrase carried to its logical conclusion, the only part of § 1401(3)(A) with any power of discrimination would be (ii). This is due to the fact that "impair" is synonymous with "injure." Oxford English Dictionary (2d ed.1989) (online edition). Technically speaking, pink eye and scraped knees seem to meet the dictionary definition of "other health impairments." Hopefully the courts will not be faced with such absurd assertions, but it would not be the first time.

5. The Court realizes that some students in gifted programs need, and should absolutely be given, special education. Where a student demonstrates the mental ability and the *motivation* to take advantage of a gifted program, no disability should deprive the child of that opportunity. However, lack of motivation will never be considered a disability in this Court until either the United States Court of Appeals for the Fifth Circuit or the United States Supreme Court explicitly holds that it is.

making special education available to the child.

■■■ While this situation is unfortunate, it nicely illustrates many of the problems with twenty-first century America: parents push their children in ill-considered directions; blame for failures is placed in the most convenient, rather than the most deserving, spot; the best interests of a child are ignored while the "adults" in the situation resort to legal action. Robert may or may not have needed a learning environment other than the LAA. What Robert definitely did need was an understanding that the responsibility for Robert's actions lies with Robert and the knowledge that good choices usually open good doors and bad choices usually open, and often compel entry through, bad doors. For the AISD's part, this Court finds that they did make a free appropriate public education "available" to Robert, which is all that they are required to do under the IDEA. *See* 20 U.S.C. § 1412(a)(1)(A). Schools are not required to force or motivate students to take advantage of the education they offer—this is the parents' role. Schools are also not required to spoonfeed students or to maximize their potential. They simply must offer a program that is reasonably calculated to confer an educational benefit upon the student.[6] AISD clearly fulfilled this responsibility in Robert's case as evidenced by, *inter alia*, Robert's achieving academic distinction on his sophomore year TAAS test.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment (Clerk's Doc. No. 15) is hereby GRANTED.

IT IS FURTHER ORDERED that the Decision of the Hearing Officer dated 12 June 2000 is hereby VACATED.

IT IS FURTHER ORDERED that this case is hereby CLOSED and any pending motions are hereby DENIED AS MOOT.

---

**6.** Failing classes is not by itself sufficient evidence that an educational benefit is not being conferred upon the student. For example, if a student demonstrates an adequate grasp of the class material on a test, but fails the class due to failure to perform assignments, one would be hard-pressed to say that the failure to turn in assignments evidences a lack of educational benefit.