**CALDWELL INDEPENDENT SCHOOL DISTRICT,**
Plaintiff,

v.

**L.P. b/n/f Joe P. and Diana P., Defendants.**

Case No. A–11–CA–653–SS.

United States District Court,
W.D. Texas,
Austin Division.

Sept. 28, 2012.

J. Erik Nichols, Amy C. Tucker, Rogers, Morris & Grover, L.L.P., Houston, TX, for Plaintiff.

Dorene J. Philpot, Philpot Law Office, P.C., Galveston, TX, Elizabeth A. Russell, Attorney at Law, Colleyville, TX, Yvonnilda G. Muniz, Law Office of Yvonnilda Muniz, P.C., Austin, TX, for Defendants.

## ORDER

SAM SPARKS, District Judge.

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Plaintiff Caldwell Independent School District (CISD)'s Motion for Summary Judgment [# 26], CISD's Supplement to Motion for Summary Judgment [# 29], Defendants Joe P. and Diana P.'s Response [# 32] thereto, and CISD's Reply [# 43]; Defendants' Motion to Strike Additional Evidence [# 33], CISD's Response [# 41] thereto, and Defendants' Reply [# 48]; Defendants' Motion for Summary Judgment [# 38], CISD's Response [# 45] thereto, and Defendants' Reply [# 49]; and CISD's Motion to Continue [# 40] and Defendants' Response [# 44] thereto.[1] Having considered the documents, the file as a whole, the arguments of counsel at a hearing regarding the foregoing motions, and the governing law, the Court now enters the following opinion and orders, granting summary judgment for Defendants.

## Background

Plaintiff CISD brings this appeal from an adverse administrative hearing ruling, under the Individuals with Disabilities Education Act (IDEA).[2] The underlying issue is what type of accommodations and learning setting should be provided for L.P., a student at CISD. Defendants Joe P. and Diana P. are L.P.'s parents. L.P. has been diagnosed with cortical visual impairment (CVI),[3] cerebral palsy (CP), and attention deficit disorder (ADD).

1. As an initial matter, CISD's Motion to Continue [# 40], which requests a continuance of its response to Defendants' Motion for Summary Judgment, is DISMISSED AS MOOT, because CISD subsequently filed a response to Defendants' summary judgment motion.

2. Citations to the four-volume administrative record shall be as follows: AR [Volume Number] at [pincite].

3. CVI is due to brain damage or neurological issues; although L.P.'s eyes are physically intact, his brain only perceives a very limited field of vision. One expert describes it as "basically looking through a soda straw." AR IV at 1–122. In fact, L.P. apparently is not only limited to a narrow field of vision, the visible field is further interrupted in places. Another expert describes it as "like [looking] through a paper towel tube ... and then put a piece of swiss cheese at the end." *Id.* at 2–61. The parties agree L.P.'s vision in each eye is limited to approximately twenty to thirty degrees, and there is some evidence it may be even less, as discussed below.

L.P.'s disabilities developed after birth, when a medication error caused a series of strokes, congestive heart failure, and loss of oxygen to the brain. Decision of the Hearing Officer Nunc Pro Tunc, AR I at 3 [hereinafter Decision]. However, CVI was not diagnosed until 2008.

The parties dispute L.P.'s intellectual capacity: Defendants argue L.P.'s abilities have been masked by the vision impairment, and, with appropriate accommodations, L.P. can function in a normal classroom. CISD argues L.P. in fact lacks the mental capacity to function in a normal classroom, even with the proposed accommodation, and would prefer to place L.P. in a special education classroom, at least for science and social studies classes. When L.P.'s parents and CISD failed to agree on this point, L.P.'s parents sought a due process hearing pursuant to 20 U.S.C. § 1415(f)(1)(A).

Before the hearing officer, L.P.'s parents raised eleven reasons why CISD had denied L.P. a free appropriate public education, as guaranteed by IDEA. These were:

1. Failure to provide an appropriate educational program individualized to meet his needs during the 2009/2010 school year and the 2010/2011 school year;

2. Failure to provide Petitioner an appropriate educational program in the least restrictive environment . . .;

3. Failure to provide Petitioner the appropriate supplementary aids and services necessary to be successful in the general education classroom;

4. Failure to provide Petitioner a one-on-one aide as an appropriate supplementary aid to enable him to be included in general education classes with his same age peers;

5. Failure to appropriately evaluate Petitioner's educational and academic needs taking into account his visual impairment;

6. Failure to appropriately evaluate Petitioner's visual impairment to address his academic needs in all classes;

7. Failure to provide an evidence based reading program appropriate to meet his needs that would address his reading deficits;

8. Failure to provide an evidence based math program appropriate to meet his needs that would address his math deficits;

9. Failure to implement recommended accommodations to enhance his ability to learn[;]

10. Failure to train the student's teachers on the student's disabilities and on implementing his IEP appropriately; and

11. Reducing the student's speech therapy services without evaluation data to justify the reduction and contrary to the student's physician's request for speech therapy and the student's need to work on social skills.

Decision at 1.

The outcome of the due process hearing, which lasted three days, was a thirty-six page order, in favor of L.P.'s position. *See* Decision at 2, 33–36. The hearing officer found CISD had failed to provide L.P. with a free appropriate public education for the year in question, and had failed to educate L.P. in the least restrictive environment, but did not adopt in toto the various allegations and requests for relief brought by L.P.'s parents. Rather, the hearing officer, after careful and exhaustive consideration of the evidence, ordered (1) an education plan in line with the IEP of 2009–2010 (which the parties agree was a year in which L.P. showed the best progress), (2) instruction in mainstream classrooms, with appropriate modifications, (3) further

testing so that IEPs going forward would be made with L.P.'s CVI conditions in mind, as well as L.P.'s other impairments, particularly any cognitive deficiencies, and (4) limited compensatory services for the period in which L.P. was denied an appropriate education. *Id.* at 33–36. In short, the hearing officer supplied the common sense the parties should have had themselves. CISD, dissatisfied with this outcome, appealed the hearing officer's determinations to this Court.

Presently, CISD has moved for summary judgment on the merits, while L.P. has moved for summary judgment on attorney's fees, as a prevailing party under IDEA. L.P. has also moved to strike additional evidence from outside the administrative record. The Court will address the motion to strike, before turning to the summary judgment motions.

## Discussion

### I. Motion to Strike Additional Evidence

■ When reviewing an administrative decision under IDEA, the Court: "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). Although the Fifth Circuit has not yet construed clause (ii) above, most circuits agree IDEA gives district courts discretion in determining whether to hear evidence from outside the administrative record. *See Walker Cnty. Sch. Dist. v. Bennett,* 203 F.3d 1293, 1298–99 (11th Cir.2000) (collecting cases). However, while not discussing this issue specifically, Fifth Circuit opinions use language suggesting district courts have little discretion to reject additional evidence. *See, e.g., Houston Indep. Sch. Dist. v. Bobby R.,* 200 F.3d 341, 347 (5th Cir.2000) ("[The

district court] must receive the record of the administrative proceedings and is then *required* to take additional evidence at the request of any party.") (emphasis added).

At issue here is a Full Individual Evaluation, conducted in 2011 (2011 FIE), and mentioned by CISD in a footnote to its *Motion for Summary Judgment. See Pl.'s Mot. Summ. J.* [# 26] at 4 n. 6. The 2011 FIE was ordered by the hearing officer, as part of the outcome of the due process hearing. ARI at 33–34. Because the language of both the statute, and of the Fifth Circuit precedent, appear to require the Court to admit such evidence upon request, the Court DENIES the motion to strike.

## II. Summary Judgment

### A. Legal Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Washburn v. Harvey,* 504 F.3d 505, 508 (5th Cir.2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Washburn,* 504 F.3d at 508. Further, a court "may not make credibility determinations or

weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Anderson*, 477 U.S. at 254–55, 106 S.Ct. 2505.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir.2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir.2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden

of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

## B. IDEA Review

■■■ In an IDEA appeal, a motion for summary judgment essentially asks the Court to decide the case based on the administrative record.[4] *See Austin Indep. Sch. Dist. v. Robert M.*, 168 F.Supp.2d 635, 638 (W.D.Tex.2001). "Under the IDEA, a federal district court's review of a state hearing officer's decision is 'virtually de novo.'" *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir.2003) (quoting *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 131 (5th Cir.1993)). "The hearing officer's findings should be accorded 'due weight,' but the district court must arrive at an independent conclusion based on a preponderance of the evidence." *Id.* (quoting *Teague*, 999 F.2d at 131). "A party attacking the appropriateness of an IEP established by a local educational agency bears the burden of showing why the IEP and resulting placements were inappropriate under the IDEA." *Bobby R.*, 200 F.3d at 347.

## C. Free Appropriate Public Education

■■■ "One of the primary purposes of the IDEA is to ensure that children with disabilities receive a 'free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living.'" *Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 583 (5th Cir.2009) (quoting 20 U.S.C. § 1400(d)(1)(A)). "[S]uch education is offered … in the least restrictive environment consistent with the disabled student's needs." *Cypress–Fairbanks Indep. Sch.*

---

4. Here, the Court does supplement the administrative record with the 2011 FIE, discussed above, but no additional evidence or testimony was put before the Court.

*Dist. v. Michael F.,* 118 F.3d 245, 247 (5th Cir.1997) (citations omitted). The basic vehicle for determining and meeting the unique needs of each disabled student is an "individual educational program" (IEP),[5] which is prepared by an "Admissions, Review and Dismissal Committee" (ARD Committee). *See id.* at 247. The free appropriate public education "need not be the best possible one, nor one that will maximize the child's educational potential; rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him 'to benefit' from the instruction." *Id.* at 247–48. "Nevertheless, the educational benefit to which the Act refers and to which an IEP must be geared cannot be a mere modicum or *de minimis;* rather, an IEP must be 'likely to produce progress, not regression or trivial educational advancement.'" *Id.* at 248 (citations omitted).

 There are four indicators of whether an IEP provides a meaningful educational benefit. *See id.* at 253. These are: "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated." *Bobby R.,* 200 F.3d at 347–48. The "least restrictive environment" encompasses the IDEA'S "preference" for educating disabled children in a regular classroom, alongside nondisabled children. *See id.* at 348.

 In addition, the IDEA "also imposes extensive procedural requirements designed to 'guarantee parents both an opportunity for *meaningful input* into all decisions affecting their child's education and the right to seek review of any decision they think inappropriate.'" *Buser ex rel. Buser v. Corpus Christi Indep. Sch.,* 51 F.3d 490, 493 (5th Cir.1995) (emphasis added) (quoting *Honig v. Doe,* 484 U.S. 305, 311–12, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988)). "Congress repeatedly emphasized throughout [IDEA] the importance and indeed the necessity of parental participation in both the development of the IEP and any subsequent assessments of its effectiveness." *Honig,* 484 U.S. at 311, 108 S.Ct. 592. The specific procedures guaranteed by IDEA include:

> (1) an opportunity for the parents to examine all the child's records and to obtain an independent educational evaluation of the child; (2) written prior notice to the parents whenever the local education agency or intermediate educational unit proposes or refuses to initiate or change the "identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to such child"; and (3) an opportunity for parents to present complaints to the agency or educational unit, including the opportunity for an due process hearing before the state or local education agency.

*Buser,* 51 F.3d at 493 (citing 20 U.S.C. § 1415(b)(1)(A), (C), (E), (b)(2)).

### D. Application

#### 1. Procedural Sufficiency

 The Court finds L.P. was denied the procedural guarantees of cooperative,

---

**5.** The IEP is a written plan, which must include "a statement (1) of the present levels of educational performance of the child, (2) of the annual goals, including short-term instructional objectives, (3) specific educational services to be provided, (4) projected date for initiation and anticipated duration of services, and (5) evaluation procedures." *Buser ex rel. Buser v. Corpus Christi Indep. Sch.,* 51 F.3d 490, 493 (5th Cir.1995) (citing 20 U.S.C. § 1401(a)(20)).

interactive decision-making in formulation of L.P.'s IEPs before the ARD Committee. *See id.* Far from being collaborative, the relationship between the CISD members of the ARD Committee and L.P.'s mother, Diana P. (who was the parent-member of the ARD Committee), plainly became completely distrustful and confrontational. The record, and the hearing officer's decision, are replete with instances of this deplorable breakdown, but a few examples will suffice here. The social studies teacher notified the administration that L.P. was failing the class, but did not provide this information to the parent because he had been instructed not to talk with the parent due to the pending dispute. AR IV at 2–17.

There were also instances in which CISD employees were less than candid with the hearing officers; in fact, they appeared to be circling the wagons in support of CISD's position, rather than giving completely honest testimony.

> The social studies teacher initially testified that he had an aide in the class to work with the student every day. However, he later acknowledged that the aide did not begin coming into the class room until around November, 2010 ... and left on maternity leave prior to the end of the Fall Semester. At the time of the hearing, he did not have an aide in his classroom.

Decision at 13.

> The counselor, when first questioned about her notes regarding [L.P.], claimed the notes were taken when she just happened to be in the classroom observing the class .... She denied going to the classroom for the specific purpose of observing [L.P.].
>
> After cross-examination and a request for clarification from the hearing officer, she eventually acknowledged that she had not been completely forthcoming in

her testimony and was in fact in the classroom for the specific purpose of observing [L.P.].

*Id.* at 20. The hearing officer described this latter instance, with commendable restraint, as "concerning." *Id.* The Court finds it rather more than concerning; it is indicative of an adversarial position taken by CISD during the IEP process, a position which precluded L.P.'s parents from having participatory input in the development of L.P.'s IEPs. Diana P.'s presence at IEP meetings does not necessarily mean she was afforded *meaningful* participation. Although the Court cannot determine the precise point in time when relations completely deteriorated, there can be no doubt CISD personnel came to view Diana P. as an adversary, and began blocking communications with or access by outside experts she had contacted, out of apparent contemplation of a due process hearing and this lawsuit. *See* Decision at 17 ("Mr. Munro [an expert hired by Diana P.] asked to speak with the VI teacher regarding [L.P.]'s programming, but that request was denied by the school's attorney, who stated in an email to the parent's attorney that any information needed by Mr. Munro was in [L.P.]'s IEPs."); *id.* at 18 (noting VI teacher's email to TSBVI asking what the purpose of any on-site visit would be, and expressing concern it would be addressed to "FAPE, LRE, and placement of students with additional needs").

The Court further agrees with the hearings officer's finding regarding the manner in which CISD's superintendent usurped the decision-making process—which by law belongs to the ARD Committee. The fact the ARD Committee overrode the superintendent's opinions on some matters in no way cures the fact the superintendent made the final decision in other instances. *See* AR IV at 67 (CISD vision teacher's

testimony that a consultation with TSBVI was rejected because "There was no educational need after a conversation with the superintendent and the principal.").

## 2. Substantive Compliance

 The parties expend a great deal of effort fighting about whether CISD considered L.P.'s CVI in preparing the IEPs in question. CISD is correct in noting reports prepared after L.P. was diagnosed with CVI acknowledge the condition. *See, e.g.,* CISD Full Individual Evaluation Disability Reporty Visual Impairment, AR II at 522. But this is beside the point. The fact that CISD had, buried in some files, reports acknowledging L.P.'s visual disability does not mean CISD actually provided an education which took CVI into account. To the contrary, the evidence overwhelmingly shows L.P.'s classroom teachers were oblivious to the nature of the visual impairment. In addition, the vision teacher persisted in evaluating the impact of L.P.'s impairment primarily in terms of mobility.[6]

For example, CISD points to an Orientation and Mobility Evaluation which occurred on October 6, 2009, as evidence CISD "conducted extensive testing to evaluate L.P.'s vision needs in the educational environment." Pl.'s Mot. Summ. J. [# 26] at 5. The report in question, however, is entirely concerned, as its title suggests, with L.P.'s ability to physically navigate throughout the school. *See* AR II at 1038–43. Although the evaluator was aware of the CVI, her only assessment which even arguably touched on L.P.'s education, rather than physical mobility, was to note, "Although [L.P.] demonstrates good vision

for travel purposes, [L.P.] may never be able to do things 'at a glance.'" *Id.* at 1043.

CISD argues the 2011 FIE shows the hearing officer was wrong. In fact, the 2011 FIE acknowledges the essential problem in this case: "The significant delay in identification and diagnosis of [L.P.'s] CVI suggest that he has spent the majority of his education without the supports necessary to develop ... appropriate accommodations to function effectively." 2011 FIE [# 26–2] at 15. Taken as a whole, the 2011 FIE suggests L.P. has serious educational challenges, due to *both* CVI, as well as his other impairments, which appear to create cognitive difficulties. *See id.* at 7–10 (addressing L.P.'s cognitive abilities); *id.* at 23 (concluding L.P. is visually impaired due to CVI). This is precisely the same conclusion reached, after a searching analysis, by the hearings officer. *See* Decision at 33.

> One of the significant difficulties in this case has been the lack of understanding by both parties with regard to the student's visual disability. The parent tends to attribute most or all of the student's difficulties to ... visual impairment. The District dismisses ... CVI, and, in fact, presented testimony that the student may no longer have an educational need for services as a student with a visual impairment.

*Id.*

> It is important to note, however, that just as school personnel erroneously discount the impact of the student's visual impairment on ... access to education, the parent is also not realistic in attributing all or most of the student's deficits

---

6. The Court notes there is evidence suggesting L.P. is quite capable to navigating familiar routes with relative ease, but has much greater trouble walking through unfamiliar areas. Given that his CISD observers saw L.P. moving through such familiar routes—around the school—the Court notes they probably underestimate the impact CVI has on L.P.'s mobility as well.

to ... visual impairment. The student has cognitive and academic delays as well as significant speech impairment. The student's cognitive, academic, language, and vision deficits are interrelated and all adversely impact [L.P.]'s education.

*Id.* at 21.

In addition, regardless of the results of particular tests, or how one parses each expert opinion and piece of testimony, the record conclusively demonstrates CISD failed to make its employees aware of the true nature of L.P.'s CVI condition, and thus failed to create or implement an appropriate IEP. Notably, CISD completely fails to join with this issue in its summary judgment motion, even though this failure is the leitmotif of the hearing officer's decision. It is undisputed L.P. has CVI, and the Court finds the preponderance of the evidence shows it severely limits his ability to see the world around him, in a way which is very different from a simple lack of visual acuity.[7] The fact that L.P.'s instructors exhibited *no understanding* of the nature of his condition is a damning failure on the part of CISD. Even if CISD is completely correct in its assessment of L.P.'s underlying mental abilities, the Court finds there is simply no way CISD could provide an appropriate education when L.P.'s teachers were so ignorant of his visual disability.[8]

The record also supports the hearing officer's conclusion CISD failed to provide L.P. with an education in the least restrictive environment (LRE). There is no dispute L.P. exhibited the best progress in the 2009–2010 academic year, within the general classroom setting. Nor is L.P. so limited in function, or so demanding as a pupil, as to entirely absorb a teacher's time, as was the case in *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1046 n. 6 (5th Cir.1989). Also, L.P. is apparently not disruptive in a disciplinary sense; L.P.'s evaluators appear to be unanimous in noting the student's cheerful demeanor, willingness to follow directions, and drive to complete tasks. Rather, the record shows L.P. makes meaningful educational progress (passing grades and making substantial progress towards IEP goals) in a mainstream classroom, as well as non-academic benefits, such as modeling the behaviors of non-disabled students. *See id.* at 1046 ("For example, a child may be able to absorb only a minimal amount of the regular education program, but may benefit enormously from the language models that his nonhandicapped peers provide for him."). As such, the Court affirms the hearing officer on the issue of LRE.

Accordingly, the Court agrees with the hearing officer, and finds L.P. was substantively denied a free appropriate public education.

7. Medical experts who have examined L.P. are apparently unanimous on this point. *See* Eye Examination Report of Dr. F. Keith Busse, Jr., AR III at 2059 (finding L.P. has "restricted peripheral visual field in both eyes" as "documented by a formal Goldmann visual field test" which showed L.P. "had fields of [vision of] less than 10 degrees [in] each eye"); Letter of Laura S. Miller, O.D., AR II at 1407 (noting L.P. has "severe visual field restrictions," despite having acuities of 20/20). Against these authorities, the Court discounts the informal tests and non-expert opinions of CISD's vision teacher.

8. The Court lays no blame upon the classroom teachers. Their concern for and good-faith efforts to educate L.P. are discernable even from the cold record. For reasons the Court cannot fully fathom, the unfortunate fact is they were not apprised by CISD of the nature or extent of L.P.'s visual disability. As a result, L.P.'s teachers made the understandable mistake of attributing L.P.'s head and eye movements—apparently made in an effort to use what little vision L.P. has—to simple inattentiveness or distraction.

## III. Attorney's Fees Under IDEA

■ Attorney's fees are available to prevailing parties under IDEA: "In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs." 20 U.S.C. § 1415(i)(3)(B)(i). Such fees are calculated under the usual lodestar approach, using the *Johnson* factors. *Jason D.W. ex rel. Douglas W. v. Houston Indep. Sch. Dist.*, 158 F.3d 205, 208–09 (5th Cir.1998). To do so, the Court first "calculates a 'lodestar' fee by multiplying the reasonable number of hours expended on the case by the reasonable hourly rates for the participating lawyers." *Id.* at 208. The Court then determines whether the lodestar amount should be adjusted, applying the twelve *Johnson* factors. *Id.* at 209. These are: "(1) the time and labor required for the litigation; (2) the novelty and difficulty of the questions presented; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the result obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Id.* (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974)).

■ The Court finds L.P. is the prevailing party, because (1) the hearing officer granted most of the relief requested, particularly education in a general classroom, and making an assessment of CVI central to future IEPs, and (2) L.P. has successfully defended the hearing officer's decision in this appeal.

■ The Court notes L.P.'s lawyers have claimed hourly rates which vary from $250 to $285 per hour, with all but seventeen of the claimed hours being billed at $250 or $255 per hour. These rates are roughly line with local averages, as the Austin–Round Rock area reported a median hourly rate of $248 in 2009. DEP'T OF RESEARCH & ANALYSIS, STATE BAR OF TEX., 2009 HOURLY FACT SHEET tbl. "2009 Median Hourly Rates by Region" (2010), *available at* http://www.texasbar.com/AM/Template.cfm?Section=Research_and_Analysis&Template=/CM/ContentDisplay.cfm&ContentID=11240.

■ However, the Court finds the hours claimed, some 557.51, are not reasonable.[9] In particular, huge numbers of hours are billed for emails back and forth between co-counsel. As such, the Court finds a more appropriate amount of hours to be 300, to which the Court will apply an hourly rate of $250, for a loadstar amount of $75,000.[10] *Cf. Cent. Sw. Tex. Dev., LLC v. JPMorgan Chase Bank, N.A.*, No. A–09–CA–819–SS, slip op. at 31 (W.D.Tex. Aug. 21, 2012) (finding 250 hours to be a reasonable time for a complex case tried to the bench, with extensive motion practice). Applying all of the *Johnson* factors, the Court finds this amount should be reduced by 25%, because L.P. argued for denial of

---

9. L.P.'s counsel seek a total fee award of $140,685.78.

10. CISD also seeks to bar recovery of hours worked for one of L.P.'s lawyers, who had to withdraw, apparently due to health issues, after doing work which is mostly reflected in

emails. *See* CISD's Resp. [# 45] at 3. The Court does not mean to suggest there was no value whatsoever to such work, merely that it has been overbilled here. The Court leaves it to L.P.'s counsel to determine how the fee award should be apportioned.

a free appropriate education as to two years before the hearings officer, but the officer found only one year had been denied. Nevertheless, no further reduction is necessary, because L.P. was successful on most other grounds, and has prevailed before this Court. The case was otherwise not unusual under the remaining *Johnson* factors. Accordingly, the Court GRANTS L.P.'s Motion for Summary Judgment on fees in part, and awards attorney's fees of $56,250.00. The Court declines to award any pre-judgment interest, but awards post-judgment interest of 0.18% per annum until paid.

## Conclusion

As is sadly typical in such cases, the parties allowed their disagreements to poison and frustrate the collaborative process by which Congress intended to safeguard the education of disabled children such as L.P.[10] The hearing officer was forced to essentially umpire this dysfunctional situation, and concluded—while finding L.P.'s parents not entirely blameless—CISD had ultimately denied L.P. a free appropriate public education. The Court agrees, and hopes CISD and L.P.'s parents will forge a more cooperative relationship going forward.

Accordingly,

IT IS ORDERED that Plaintiff Caldwell Independent School District's Motion to Continue [# 40] is DISMISSED AS MOOT;

IT IS FURTHER ORDERED that Defendants L.P. b/n/f/ Joe P. and Diana P.'s Motion to Strike Additional Evidence [# 33] is DENIED;

IT IS FURTHER ORDERED that Plaintiff Caldwell Independent School District's Motion for Summary Judgment [# 26] is DENIED;

IT IS FURTHER ORDERED that the Decision of the Hearing Officer, No. 058–SE–1110 (July 2, 2011) is AFFIRMED in all respects;

IT IS FURTHER ORDERED that Defendants L.P. b/n/f/ Joe P. and Diana P.'s Motion for Summary Judgment [# 38] is GRANTED IN PART;

IT IS FINALLY ORDERED that Plaintiff Caldwell Independent School District shall pay Defendants L.P. b/n/f/ Joe P. and Diana P. reasonable attorney's fees of FIFTY–SIX THOUSAND TWO HUNDRED FIFTY DOLLARS ($56,250.00), with post-judgment interest at the rate of 0.18% per annum until paid.

---

10. The Court advises the parties to remember they must continue to work with each other for as long as L.P. is enrolled with CISD, regardless of the outcome of this lawsuit, and L.P.'s interests will be better served if they proceed in a spirit of patience and cooperation.